FILED
United States Court of Appeals
Tenth Circuit

February 12, 2019

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANUPAMA BEKKEM,

      Plaintiff - Appellant,

v.

ROBERT WILKIE, Secretary, U.S.
Department of Veterans Affairs,[*]

      Defendant - Appellee.

No. 17-6186

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. 5:14–CV–00996–HE)**

---

Amber L. Hurst (Mark Hammons with her on the reply brief), of Hammons, Gowens &
Hurst, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Scott Maule, Assistant U.S. Attorney (Robert J. Troester, Acting U.S. Attorney, and Tom
Majors and Daniel J. Card, Assistant U.S. Attorneys, with him on the brief), Oklahoma
City, Oklahoma, for Defendant-Appellee.

---

Before **LUCERO**, **McKAY**, and **MATHESON**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

    [*] Current Secretary Robert Wilkie has been automatically substituted for the prior
Secretary pursuant to Rule 43(c)(2) of the Federal Rules of Appellate Procedure.

Plaintiff Anupama Bekkem brought this action against her employer, the Department of Veterans Affairs, based on numerous instances of discrimination and retaliation she allegedly experienced while working as a primary care physician for the VA in the Oklahoma City area. The district court dismissed some of her claims under Rule 12(b)(6) and granted summary judgment in favor of Defendant on the remaining claims. On appeal, Plaintiff seeks reversal of the district court's ruling as to four of her claims, all of which arise under Title VII of the Civil Rights Act of 1964: (1) gender discrimination based on unequal pay; (2) retaliation based on the VA's choice of a different physician to fill a medical director position after Plaintiff had made protected complaints of discrimination; (3) retaliation based on a written reprimand she received after sending an email complaining of discrimination in physician pay; and (4) discrimination because of race, sex, color, national origin, and/or religion based on the same written reprimand. The first three of these claims were disposed of on summary judgment; the final claim was dismissed under Rule 12(b)(6) for failure to state a plausible claim for relief.

**I.**

Because Plaintiff raises a claim regarding her pay, it is necessary as an initial matter to briefly describe how VA physicians' pay is calculated. The salaries of VA physicians are "governed by a complex scheme of statute, regulation, VA handbooks, and internal agency guidance and rules." (Appellant's App. at 366.) A VA physician's

annual salary includes three components: (1) base pay, which is determined solely by "the physician's length of service with the VA"; (2) market pay, which is based on an individualized assessment of several factors including the physician's experience and accomplishments, the needs of the facility where the physician is assigned, and the applicable healthcare labor market for the physician's specialty or assignment; and (3) performance pay, which is based on the achievement of performance objectives set by management and may not exceed the lower of $15,000 or 7.5% of the physician's combined base pay and market pay. (*Id.* at 367.) *See* 38 U.S.C. § 7431. A physician may also receive an additional discretionary payment of retention pay, relocation pay, and/or recruitment pay in certain circumstances. (Appellant's App. at 367-68.)

Under the applicable statute and VA policy, a physician's market pay should be reviewed at least once every two years by a compensation panel, which makes salary recommendations to the medical director of the regional VA healthcare system. 38 U.S.C. § 7431(c)(5); (Appellant's App. at 368-69). The regional medical director is the ultimate decisionmaker on the question of physician pay and may thus accept, reject, or alter the compensation panel's recommendations. Compensation panels are composed of a diverse group of men and women from different medical services. These panels meet weekly, and the particular panel members participating in each week's review may vary. Compensation panels do not review all VA physicians' market pay at the same time, but rather conduct individual pay reviews that "tend to be spread out due to scheduling

-3-

demands, efficiency, and need." (Appellant's App. at 369.)

Plaintiff began working for the VA healthcare system in 2006. Following a compensation panel review, she received a market pay increase in May 2009. On January 1, 2011, the federal government instituted a pay freeze that would last for three years. Due to the freeze, VA officials were instructed that market pay adjustments to physicians' salaries could only be granted "under exceptional circumstances." (*Id.* at 565.) Given this guidance, the regional Oklahoma City VA network "did not always conduct pay panel reviews within the obligatory two-year period, because management felt there was no reason if there could effectively be no change to market salaries." (*Id.* at 370.) Both male and female doctors from various medical services did not receive timely biennial compensation panel reviews during the pay freeze. The VA presented evidence that, due to the staggered nature of the biennial compensation reviews, "those physicians who received a compensation panel review closest to the implementation of the pay freeze tended to have higher market pay," while those—like Plaintiff—whose last review had occurred further before the pay freeze "tended to have their lower pre-review salary locked in for the full three years of the pay freeze, which resulted in some pay discrepancies in all of the various services." (*Id.*) Moreover, the competitive labor market and the fact that newly hired physicians were not locked in to an existing salary meant that newly hired physicians were sometimes brought in at salaries that exceeded many of the longer-term physicians' salaries, contributing to the pay discrepancies across

the various medical services. According to the VA's uncontested expert evidence, "[t]here [wa]s no statistically significant difference in the . . . market pay of female and male primary care physicians" employed in the regional VA healthcare system throughout the relevant time period. (*Id.* at 378.)

Plaintiff's supervisor—a physician who supervised Plaintiff first as the Medical Director of Primary Care and then as the Chief of Ambulatory Care—initiated a pay review for Plaintiff in 2012, during the pay freeze. He did not participate in her compensation panel review, which occurred in July 2012 and recommended only an increase in base pay. In accordance with the compensation panel's recommendation and the guidance given to VA management officials regarding implementation of the pay freeze, the regional medical director approved an increase of $3,267 in Plaintiff's base pay but did not adjust her market pay.

In September 2012, Plaintiff transferred from the main VA clinic in Oklahoma City to a satellite clinic office that the parties refer to as the North May clinic. In early 2013, Plaintiff began having problems with a registered nurse who had recently been assigned to her four-person team at the North May clinic. Their relationship deteriorated to the point that each of them contacted an Equal Employment Opportunity counselor in May 2013 to complain of a hostile work environment. In her May 2013 contact with the EEO, Plaintiff asserted that she had been subjected to a hostile work environment and discrimination based on her "sex (female), National Origin (India), race (Asian-Indian),

color (Brown), [and] religion (Hindu)." (*Id.* at 72.)

On August 8, 2013, Plaintiff's supervisor sent an email to several VA physicians, including Plaintiff, about the shifts they needed to fill at a regional clinic that had recently lost two primary care physicians. The attached schedule indicated that Plaintiff's supervisor was scheduled to spend four days working at the clinic, while Plaintiff was scheduled for a single day there. Plaintiff responded to her supervisor's email with her own lengthy email, sent on August 19, 2013, in which she asserted that she should not be required to "cover at [the clinic] because you in the physician management[] couldn't do your jobs right." (*Id.* at 485.) She stated, "You all can fix your mess-ups by going to [the clinic] yourself and taking care of the patients there. . . . Since I didn't get a $50,000 raise like you did, I don't think I should be the one to fix your mistakes." (*Id.*) She further stated that she had "turned down an extra $13,000 for weekend ER coverage" and was unwilling to now accept an increase in her work load with no compensation. (*Id.*) Plaintiff copied several VA health-care providers in her response to her supervisor and then forwarded her response to numerous other VA employees as well.

Plaintiff continued to have problems with the nurse assigned to her team at the North May clinic, and on August 27, 2013, her supervisor sent her an email informing her that the physician management had decided to separate her from the "dysfunctional environment" in her team by transferring her back to the main VA facility in Oklahoma City as of August 29, 2013. (*Id.* at 490.) Plaintiff responded with an email, also sent on

August 27, 2013, which she again forwarded to numerous other VA employees. In this email, she complained about the way her supervisor and other management officials had handled the conflict between Plaintiff and the nurse on her team. She complained that this nurse was "lazy and vindictive," described her as an insubordinate liar, and accused VA managers, particularly her supervisor, of various types of wrongdoing. (*Id.* at 489–90.) Plaintiff then stated that she would be proceeding with a formal EEO complaint.

Approximately thirty minutes after sending this email, still on the evening of August 27, 2013, Plaintiff sent another email to numerous VA employees, including her supervisor and other management officials. This email was entitled "Information received by filing a FOIA request related to my EEO action related to Ambulatory Care Physic[i]ans' pay." (*Id.* at 492.) In this email, Plaintiff explained that she had filed a Freedom of Information Act request to obtain the salary data of physicians employed by the VA regional network in Oklahoma City, which she was attaching to her email for her colleagues to consider. She suggested that the other physicians review this data and draw their own conclusions, and she listed some of the conclusions she had drawn. For instance, she had concluded that "[f]emales seem to be paid less than males" and, "[i]n general, Foreign Born or non-white physicians make less than white physicians." (*Id.*) She also observed that one male doctor had apparently been paid for two years while he was away pursuing a fellowship, and she asked: "I wonder how we too can get this

awesome deal? Maybe some money changed hands to make this happen?" (*Id.*) She

advised her colleagues to "[r]eview the data at your leisure and figure out your worth to

the organization." (*Id.*)

In a letter dated August 27, 2013, Plaintiff's supervisor informed her that he was

proposing a reprimand for inappropriate conduct. He specified three reasons for the

proposed reprimand:

> **Specification 1:** On or about August 27, 2013 you exhibited inappropriate
> conduct in an email that you sent to me and multiple other employees. In
> the email you stated to me, among other things, "I was already a US citizen
> the day I started at this job, unlike you who used the VA to get your visa
> paperwork done. . . . [The nurse] is lazy and vindictive. . . . The physician
> management has no backbone, and all you are interested in is dumping
> work on the rank and file, and padding your paychecks. . . ."

> **Specification 2:** On or about August 19, 2013 you exhibited inappropriate
> conduct in an email that you sent to me and multiple other employees. In
> the email you stated to me, among other things, "So we have to cover at [the
> other clinic] because you in the physician management, couldn't do your
> jobs right. . . . So how come you need us to help you now, with something
> you and the rest or [sic] leadership team messed up? You all can fix your
> mess-ups by going to [the clinic] yourself and taking care of the patients
> there. . . ."

> **Specification 3:** On or about August 27, 2013 you sent an inappropriate
> email to several employees who you labeled "Colleagues." In the email you
> alleged various complaints regarding the pay of physicians at this facility.
> In your email you made an allegation by stating, "Maybe some money
> changed hands to make this happen?"

(*Id.* at 483 (most alterations in original).) On September 30, 2013, after considering

Plaintiff's response to the proposed reprimand, the Chief of Staff—Plaintiff's second-line

supervisor—issued a reprimand for the same reasons stated in the proposed reprimand.

Plaintiff was informed that a copy of the reprimand would be placed in her electronic Official Personnel Folder and that "any future offenses or violations of rules for which disciplinary action would be appropriate could result in a more severe penalty, up to and including removal." (*Id.* at 495.)

Plaintiff filed a formal EEO complaint on September 5, 2013, and an amended complaint on November 21, 2013. In her amended EEO complaint, she not only reiterated her previous complaints of discrimination and a hostile work environment, but also claimed retaliation on numerous grounds, including her receipt of a reprimand while her informal EEO complaint was pending.

The pay freeze ended on December 31, 2013, and Plaintiff's supervisor soon thereafter recommended a compensation panel review and pay raise for Plaintiff. The compensation panel reviewed her pay in March and April of 2014 and recommended two different raises that together increased Plaintiff's market pay (and thus her total pay) by more than $20,000. Plaintiff's supervisor participated in both of these favorable compensation panel reviews. The regional director approved the compensation panel's recommendations, and thus Plaintiff received the recommended increase of more than $20,000 to her total salary soon after the pay freeze ended.

Plaintiff filed this federal lawsuit in September 2014, alleging discrimination and retaliation based on numerous allegedly improper actions taken by her employer. As pertinent here, she alleged that her pay was lower than other comparable physicians' pay

because of her gender and/or other protected characteristics and that the reprimand she received in September 2013 was based on discriminatory and/or retaliatory motives.

In November 2014, the VA posted a job opening for a position as the medical director of the North May clinic where Plaintiff had worked from September 2012 through August 2013. The clinic had not previously had an official medical director, but a primary care physician who worked at this clinic had been volunteering as a liaison or lead physician, carrying out all the responsibilities that the new medical director position would entail, since September 2012. Plaintiff's supervisor was responsible for making the hiring decision for this position, and he received applications from only two applicants who met the minimal qualifications required to serve as the medical director for the North May clinic: the physician who had already in essence been acting as the medical director of the clinic for the past two years in his volunteer role as lead physician, and Plaintiff. In January 2015, each candidate was interviewed by a panel of medical providers. Each member of the panel scored the North May clinic lead physician higher than Plaintiff. Plaintiff afterwards complained to her supervisor that the panel members had asked her about her prior EEO activity. He accordingly disregarded the results of these interviews and requested a second panel to be constituted of "four individuals (men and women) who were not believed to have knowledge of Plaintiff's EEO complaint, and an H.R. representative." (*Id.* at 361; 584–85.) This second panel interviewed both candidates, and again each panel member gave the lead physician higher scores than

Plaintiff. Plaintiff's supervisor then conducted his own interviews of each candidate and selected the North May lead physician to fill the new medical director position. Plaintiff was informed that she had not been selected for this position on March 23, 2015.

Also in March 2015, the district court dismissed several of the discrimination claims in Plaintiff's complaint under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. The court held that the only claim of discrimination which stated a plausible claim for relief was Plaintiff's claim of unequal pay based on her gender. All of Plaintiff's other claims of discrimination, including her claim of race, sex, color, national origin, and/or religious discrimination based on the reprimand she received, failed to state a plausible claim for relief because "'there is nothing other than sheer speculation to link'" the complained-of acts "'to a discriminatory motive.'" (*Id.* at 94 (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012) (ellipsis omitted)).) With the exception of her gender pay claim, Plaintiff's complaint simply "contain[ed] no facts from which it c[ould] be inferred that defendants [discriminated against her] because of a protected characteristic." (*Id.*)

Plaintiff filed an amended complaint to attempt to address these deficiencies, but the district court held that her conclusory assertion that "[o]ther physicians, who did not share in [her] protected characteristics" were treated differently was insufficient to support the inference that the VA discriminated against her based on her membership in a particular protected class. (*Id.* at 194.)

In October 2015, Plaintiff filed a second amended complaint, adding a new claim of retaliation based on the VA's decision not to hire her for the medical director position at the North May clinic.

The district court ultimately granted summary judgment in favor of Defendant on each claim raised in the second amended complaint, holding that the facts, taken in the light most favorable to Plaintiff, demonstrated that Defendant was entitled to judgment as a matter of law on each claim.

Plaintiff appeals the district court's entry of summary judgment as to three of the claims included in her second amended complaint: (1) gender discrimination under Title VII of the Civil Rights Act based on unequal pay; (2) retaliation under Title VII based on her non-selection for the North May medical director position; and (3) retaliation under Title VII based on the September 2013 reprimand. She also appeals the district court's earlier dismissal of her claim of Title VII discrimination based on the same reprimand.

## II.

We review the district court's entry of summary judgment de novo, applying the same standards as the district court. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). We also review de novo the district court's dismissal of a claim under Rule 12(b)(6). *Khalik*, 671 F.3d at 1190. "Our review of each of the district court's rulings requires us to view the allegations and evidence in the light most favorable to [Plaintiff as] the non-movant." *Witt v. Roadway Express*, 136 F.3d 1424, 1428 (10th Cir.

1998).

To survive summary judgment on a Title VII claim of discrimination based on race, color, religion, sex, or national origin, a plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik*, 671 F.3d at 1192. Under the *McDonnell Douglas* framework, a plaintiff must first "raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted). The burden then "shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* If the employer does so, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (internal quotation marks omitted).

A claim of Title VII retaliation can likewise be proven either by direct evidence or by reliance on the *McDonnell Douglas* framework. *Khalik*, 671 F.3d at 1192. To state a prima facie Title VII retaliation claim, "a plaintiff must show (1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Id.* at 1193 (internal quotation marks and brackets omitted).

We begin by addressing Plaintiff's claim of gender discrimination based on unequal pay. As an initial matter, it is important to note the scope of this claim. First, this claim is based solely on the time period between September 2011 and March 2014, a period which corresponds with the federal pay freeze for all but the last three months. Second, this claim is limited to the market pay component of Plaintiff's total salary and does not include any claims relating to base pay, performance pay, or any other aspects of her compensation. Finally, Plaintiff's claim of pay discrimination is based entirely on the actions of her supervisor, who she alleges held discriminatory bias against women. Specifically, she contends that her supervisor caused her to receive lower pay than male VA physicians by failing to recommend an earlier compensation panel review of her salary during the pay freeze and/or by failing to recommend that her market pay be increased during this time period. She does not allege—and has presented no evidence to suggest—any discrimination on the part of the compensation panel that reviewed her pay in 2012 or any of the regional directors who were the ultimate decisionmakers on the question of her pay.

Because Plaintiff has presented no direct evidence of discrimination, we analyze her claim under the burden-shifting *McDonnell Douglas* framework. At the first step of this analysis, we assume without deciding that Plaintiff has presented sufficient evidence to establish a prima facie case of pay discrimination. At the second stage of this analysis, the VA has come forward with a legitimate, non-discriminatory reason that Plaintiff's pay

was lower during the relevant time period than many other VA physicians (both male and female) with comparable experience—due to the timing of the federal pay freeze in conjunction with the biennial pay review process, the market pay component of Plaintiff's salary was frozen at an amount fixed in May 2009, while many other physicians' pay was frozen at a higher amount that had been fixed at a later date. The VA has also explained that there were two exceptions to the freeze in market pay increases: (1) some physicians received a market pay increase, with a corresponding increase in their total salary, because they took on additional duties during the pay freeze; and (2) a new accounting policy caused certain other types of pay (specifically, relocation, recruitment, and retention pay) to be recharacterized as market pay, thus increasing the market pay component of some physicians' salaries without affecting the total compensation they received. Neither of these exceptions was applicable to Plaintiff—or to a number of other VA physicians—because she did not take on additional job duties during the pay freeze, and she had not been receiving any of the types of pay that were recharacterized as "market pay" during the freeze. Finally, the VA has explained that, because market pay could not be increased during the pay freeze unless one of these two exceptions applied, VA officials "did not always conduct pay panel reviews within the obligatory two-year period, because management felt there was no reason if there could effectively be no change to market salaries," and thus "[b]oth males and females, in many different services . . . , did not receive timely [biennial] compensation panel review." (Appellant's App. at

-15-

370.) The VA's proffered evidence of these non-discriminatory reasons for the pay situation during the federal pay freeze is sufficient to meet its "exceedingly light burden," *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (internal quotation marks omitted), at the second stage of the *McDonnell Douglas* analysis.

Thus, the burden now reverts back to Plaintiff to establish pretext. To show that the VA's proffered gender-neutral reasons for Plaintiff's delayed compensation panel review and lack of a market pay increase during the pay freeze were pretextual, Plaintiff must show that the proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004)). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan*, 108 F.3d at 1323 (internal quotation marks and brackets omitted).

Plaintiff first argues that the VA's explanation is false because male physicians received market pay increases during the pay freeze even when they did not take on additional job duties or have other components of their pay recharacterized as market pay. Plaintiff's only evidence in support of this argument is the pay stub of one male physician who she contends did not fall into either of the VA's asserted exceptions to the pay freeze because his pay stub shows that he received an increase in both market pay and total

-16-

salary despite the fact that he remained assigned to general internal medicine at the time of the salary increase. Notably, however, this pay stub in fact indicates that this physician received a "change in assignment" warranting a pay increase even though he kept working in general internal medicine (Appellant's App. at 711), which appears to be entirely consistent with the Chief of Ambulatory Care's explanation that this physician received higher market pay because, "in addition to and outside his Monday through Friday primary care working hours," he "performs specialized duties such as compensation and pension exams and environmental exams for Agent Orange patients" (*id.* at 364). Plaintiff has presented no other evidence to support her contention that male physicians received market pay increases outside the two exceptions identified by the VA, and we are persuaded that the pay stub is insufficient to create a material dispute of fact on this point.

Second, Plaintiff argues that a jury could find pretext because the VA's explanations have been inconsistent. She contends that the VA first stated that market pay could only be increased if physicians took on additional job duties, but later added a new purported reason for market pay increases by mentioning that other components of pay were recharacterized as market pay during the pay freeze. This argument is based solely on Plaintiff's mischaracterization of the evidence. In fact, the VA's explanation has been entirely consistent throughout this litigation. In discussing physicians' "salaries," of which market pay is only one component part, Plaintiff's supervisor

explained that physicians could only obtain salary increases during the pay freeze by taking on additional job duties. (*Id.* at 620.) He also explained that some apparent salary increases had not actually been increases to the physician's salary, but simply reflected a recharacterization of the component parts of their salary for accounting purposes. The VA has never deviated from this explanation, which is supported by contemporaneous records that Plaintiff has done nothing to refute.

Third, Plaintiff argues that the jury could find the VA's explanation to be pretextual because the VA prepared a table showing individual physicians' pay from 2009 to 2014 that Plaintiff argues is "inaccurate and misleading" because it "overstat[es] female pay and leav[es] out other kinds of pay components." (Appellant's Opening Br. at 22.) Plaintiff does not further elaborate on these accusations. To the extent she is attempting to re-assert the argument she made below that the chart is inaccurate because it does not include performance pay as a component of the physicians' total compensation, we note that Plaintiff's claim of discrimination is limited solely to the issue of market pay, and we are not persuaded that a reasonable jury could find the VA's explanation for the market pay freeze to be pretextual simply because the VA's chart does not include a comparison of a category of physician pay that is not at issue in this case. Moreover, Plaintiff has waived this and any other challenge to the accuracy of this evidence by failing to adequately brief or support her argument. *See Adler*, 144 F.3d at 679.

Fourth, Plaintiff contends that the jury could find pretext because her supervisor demonstrated bias towards women by allegedly selecting male physicians over female physicians for positions of authority and later expressing dissatisfaction with Plaintiff's filing of an EEO complaint. However, even assuming the jury could draw some inference of gender bias from these purported facts, in order to establish pretext Plaintiff "must still show some nexus," *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1210 (10th Cir. 1999), between her supervisor's discriminatory statements or actions and the adverse employment action at issue in this case. Even when a decisionmaker has made discriminatory statements, this is insufficient to establish such a nexus; rather, something in the decisionmaker's statements must link them to the adverse employment action at issue in the case. *Id.* Plaintiff has shown no such nexus. The adverse employment action at issue here is the VA's failure to increase Plaintiff's market pay from September 2011 until March 2014. She contends her supervisor caused this adverse action by failing to recommend her for a compensation panel review during the federal pay freeze. However, her supervisor in fact recommended her for a compensation panel review in mid-2012, and it was the compensation panel and the regional director, not Plaintiff's supervisor, who decided not to increase her market pay. Plaintiff has presented no evidence—nor has she even argued or alleged—that the compensation panel or regional director held any discriminatory animus, and she has likewise presented no evidence that her supervisor affected their decision to follow the VA's guidelines for market pay increases during the

-19-

pay freeze. Nor has Plaintiff presented any evidence suggesting that she would have received an increase in market pay during the pay freeze if her supervisor had recommended her for a compensation panel review at any point between September 2011 and July 2012, while the same pay freeze policies were in effect. Thus, she has not shown that her supervisor even affected her market pay during the pay freeze, much less a nexus between the pay she received and her supervisor's hiring practices or his attitude toward her subsequent filing of an EEO complaint. Finally, we note that Plaintiff does not address the short period of time that elapsed between the end of the federal pay freeze on December 31, 2013, and her next compensation panel review—recommended by her supervisor—in mid-March 2014. The record reflects that Plaintiff was in India on FMLA leave when the pay freeze ended, and, to the extent any argument regarding this time period was not waived by Plaintiff's failure to specifically address it, we are not persuaded that the jury could find pretext based on the timing of her compensation panel review after her return.

Fifth, Plaintiff argues that a rational factfinder could find the VA's explanation to be pretextual simply because her pay was lower than several male physicians' pay during the relevant time period. However, where the VA came forward with a non-discriminatory explanation for this apparent disparity in pay, the existence of the apparent disparity does not in itself prove that the VA's explanation must be a pretext for discrimination. *See E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1319 (10th Cir. 1992)

("Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics."). To hold otherwise would eviscerate the *McDonnell Douglas* framework by allowing a plaintiff to establish pretext simply by reiterating her prima facie case. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, *combined with sufficient evidence to find that the employer's asserted justification is false*, may permit the trier of fact to conclude that the employer unlawfully discriminated." (emphasis added)). The mere fact that Plaintiff's pay was lower than several of her male colleagues' pay is insufficient to show that the VA's proffered explanation for her lower pay was unworthy of belief.

Finally, Plaintiff points out that in evaluating pretext we do not "look at each piece of evidence in isolation," but rather consider all of the plaintiff's evidence "in its totality," *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008), and she contends that the district court erred in analyzing each of her arguments on pretext separately rather than considering her arguments and evidence as a whole. We see no such error in the district court's analysis, and we further note that, while we here address Plaintiff's arguments sequentially for ease of analysis, we have considered her evidence in its totality and find all of her evidence, taken as a whole, insufficient to permit an inference

-21-

of pretext. We accordingly affirm the district court's entry of summary judgment in favor of Defendant on Plaintiff's claim of gender discrimination based on unequal pay.

We turn then to Plaintiff's claim of retaliation based on her supervisor's selection of a male physician instead of Plaintiff for the position of North May medical director. As previously noted, to establish a prima facie case of Title VII retaliation, Plaintiff must show "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Khalik*, 671 F.3d at 1193 (internal quotation marks and brackets omitted).[1] We hold that Plaintiff has failed to establish a prima facie case of retaliation because she has not established a causal connection between any protected activity and her non-selection for the medical director position.

To establish a causal connection, a plaintiff must "present evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d

---

[1] Like the district court, we note that it is not entirely clear whether Plaintiff, as a federal employee, can bring a retaliation claim against the VA. *See Green v. Brennan*, 136 S. Ct. 1769, 1774 n.1 (2016) (assuming without deciding that such a claim could be brought); *see also id.* at 1792 n.2 (Thomas, J., dissenting) (arguing that federal employees may not bring Title VII retaliation claims because "Title VII's federal-sector provision incorporates certain private-sector provisions related to discrimination but does not incorporate the provision prohibiting retaliation in the private sector"). Because neither the parties nor the district court have addressed this argument, we will likewise assume without deciding that such a claim is available to Plaintiff. We express no opinion as to whether the district court should address this issue on remand of the second retaliation claim, nor do we express any opinion as to what the correct resolution of this issue would be.

1199, 1203 (10th Cir. 2014) (internal quotation marks omitted). "If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Id.* However, a three-month gap between protected activity and an adverse action is too long to support an inference of causation on its own. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). Thus, where a gap of three months or longer has occurred, a plaintiff must present other evidence—"'more than mere speculation, conjecture, or surmise'"—to establish that her protected activity was a but-for cause of the adverse employment action. *Ward*, 772 F.3d at 1203 (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

It is undisputed in this case that Plaintiff's last protected activity occurred more than three months before the VA decided not to select her for the medical director position. (*See* Appellant's Opening Br. at 30 ("[Plaintiff's] most recent protected activity was her Sept. 16, 2014, filing of a federal gender discrimination lawsuit."); *see also* Appellant's App. at 361 (stating that the first set of interviews occurred in January 2015); *id.* at 691 (indicating that Plaintiff's non-selection for the position occurred on March 23, 2015).) Plaintiff argues that she presented other evidence of causation in the form of her testimony that in 2013 her supervisor expressed anger regarding her filing an EEO complaint and said he did not want her to continue with the complaint. We note that her testimony was rather ambiguous on this point. Although she said, "Yes," when asked

whether her supervisor ever expressed anger at her filing the complaint, her own

explanation of the situation was:

> He was angry at me complaining about [the nurse assigned to her team at North May] and he was angry about revealing all the stuff what is going on in the primary care to the chief of staff and the medical director. And he would nitpick on small administrative stuff and comment on those. . . . So he was very upset.

(Appellant's App. at 664–65.) Despite being asked to elaborate, Plaintiff never described

a single conversation in which her supervisor's alleged anger was directed at her EEO

complaint of discrimination rather than personnel problems. Likewise, although Plaintiff

testified broadly that her supervisor "didn't want [her] to continue with the EEO

complaint," when she was asked to elaborate on any conversations in which her

supervisor told her not to continue with the complaint, she responded:

> It was before I formally complained to the EEO, just around the time when I met with [another VA physician manager]. Also when he dropped by one time, he said this is not right, you are not supposed to do these things and—but I cannot reassign [the North May nurse], but you have to suck it up and just do it. You don't have a choice, if you want to, we can send you back to the main VA to be punitive in that sense.

(*Id.* at 665.) On cross-examination, Plaintiff clarified that she did not remember exactly

what her supervisor said, but she inferred that he meant she should not be pursuing an

EEO complaint. (*Id.* at 817.)

Even viewing this ambiguous testimony in the light most favorable to Plaintiff, we

still are not persuaded that a reasonable jury could find a non-speculative link between

Plaintiff's supervisor's alleged attitude towards her EEO complaint in 2013 and

Plaintiff's non-selection for the position as North May medical director in 2015. First, we note that any link between Plaintiff's supervisor's vague alleged comments in 2013 and his hiring decision in 2015 is attenuated in both time and subject. Plaintiff has presented no evidence that her supervisor ever mentioned her discrimination action after she filed her formal EEO complaint in the fall of 2013. She argues that a jury could infer that her supervisor was still angry about the discrimination action in 2015 because he told her at that time that he would make sure she did not get the medical director position. However, Plaintiff's own testimony clarifies that her supervisor said he would not hire her for this position specifically because of her acrimonious "history with [the nurse] at the North May clinic," not for any other reason. (*Id.* at 669.) On appeal, Plaintiff asks us to speculate that her supervisor was instead motivated by the same anger he had allegedly expressed towards her EEO complaint in 2013, but none of her evidence supports this speculation. Moreover, Plaintiff's supervisor's alleged statements in 2013 were centered around her relationship with the nurse at the North May clinic, not the EEO complaint, and the only action he allegedly threatened to take against her was to transfer her back to the main office in Oklahoma City. He did not threaten her with any other consequences for either her personnel complaints or her EEO complaint, and in fact the intervening year saw him recommending and participating in two compensation panel reviews in which Plaintiff received a salary increase of more than $20,000, contrary to Plaintiff's

-25-

speculative assertion that he continued making adverse employment decisions against her because of lingering retaliatory animus.

Additionally, any possible connection that could be drawn between Plaintiff's complaint of discrimination and her later non-selection for the position as North May medical director is further negated by the uncontested record evidence regarding the relative merits of the two applicants for this position. It is undisputed that the other applicant had in essence already been acting as the medical director of the North May clinic for the past two years in a volunteer capacity, carrying out all of the responsibilities that this new position would now entail. In contrast, Plaintiff had been transferred away from the North May clinic in 2013 because of the dysfunctional relationship she had with a nurse who was employed there. As we held in *Ward*, "[a] reasonable fact-finder could not infer retaliation from the decision to keep another employee in his job rather than replace him with someone who had admittedly experienced 'interaction issues' with other employees." 772 F.3d at 1204. Plaintiff has presented no evidence of any way in which she was objectively more qualified than the North May clinic lead physician to fill the position of North May clinic medical director; to the contrary, the uncontested record evidence reflects that the other physician had significantly more experience than Plaintiff both in the medical profession generally and with the VA specifically, and Plaintiff has not shown that she had any additional certifications or qualifications that he lacked. Additionally, the panel of medical directors who interviewed Plaintiff and the North May

clinic lead physician unanimously scored him higher than Plaintiff. In her deposition, Plaintiff not only conceded this fact, but also conceded that the other applicant "should score higher" because of his two years of experience acting as the North May clinic liaison. (Appellant's App. at 463.) Even taken in the light most favorable to Plaintiff, the facts of this case simply do not "'justify an inference of retaliatory motive,'" *Ward*, 772 F.3d at 1203 (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)), in the VA's decision to hire the North May clinic lead physician instead of her for the position of North May medical director. Plaintiff has failed to meet her burden of showing that "the desire to retaliate was the but-for cause of the challenged employment action," *Nassar*, 570 U.S. at 352, and we thus affirm the district court's grant of summary judgment in favor of Defendant on this claim of retaliation.

Nevertheless, we reach the opposite conclusion on Plaintiff's second claim of retaliation, which is based on the written reprimand she received for sending three emails that her supervisor found objectionable, including an August 27 email she entitled "Information received by filing a FOIA request related to my EEO action related to Ambulatory Care Physic[i]ans' pay," which discussed the data allegedly supporting her claim of discrimination. (Appellant's App. at 492.) The VA does not dispute that the reprimand, recommended on the same day Plaintiff sent this email, is sufficient to establish a prima facie case of retaliation, but it contends that Plaintiff has not come forward with sufficient evidence of pretext to rebut the VA's legitimate non-retaliatory

-27-

reason for the reprimand. However, taking all of the evidence and the inferences to be drawn therefrom in the light most favorable to Plaintiff, we are persuaded that Plaintiff's evidence is sufficient for a jury to find the VA's proffered explanation to be pretextual, and we therefore reverse the district court's ruling.

The proposed reprimand included the following paragraph, which was incorporated by reference into the actual reprimand issued in September 2013:

> **Specification 3:** On or about August 27, 2013 you sent an inappropriate email to several employees who you labeled "Colleagues." In the email you alleged various complaints regarding the pay of physicians at this facility. In your email you made an allegation by stating, "Maybe some money changed hands to make this happen?"

(Appellant's App. at 483.) The VA asserts that it had a legitimate, non-retaliatory reason to reprimand Plaintiff for sending this email: as noted in the last sentence of Specification 3, Plaintiff made an accusation of bribery in her email, and this accusation of criminal behavior warranted a reprimand. The VA acknowledges that the reprimand also mentions Plaintiff's "alleg[ation of] various complaints regarding the pay of physicians at [the VA]." (*Id.*) However, the VA contends that the reprimand mentioned these allegations merely to clarify which August 27 email was the subject of Specification 3, while the reprimand itself was based only on the accusation of bribery described in the third sentence of the specification. This may be a plausible explanation of the reprimand, but it is not the only plausible explanation. Although a jury might ultimately agree with the VA's explanation, the facts taken in the light most favorable to Plaintiff are sufficient to

-28-

support a reasonable inference that the reprimand actually mentioned Plaintiff's allegations of discrimination for the simple reason that Plaintiff's supervisor wanted to punish her for sending her colleagues an email that alleged the VA was discriminating against female, foreign-born, non-white physicians. Given the timing and the wording of the reprimand, we are persuaded that Plaintiff has met her burden of showing that a reasonable jury could find the VA's explanation to be "'pretextual—i.e., unworthy of belief,'" *Morgan*, 108 F.3d at 1323 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)). We therefore reverse the entry of summary judgment in favor of Defendant on this claim and remand this claim for further proceedings.

Finally, we address the district court's Rule 12(b)(6) dismissal of Plaintiff's claim of race, sex, color, national origin, and/or religious discrimination based on the reprimand. In her original complaint, Plaintiff alleged that the reprimand was discriminatory simply because "[o]ther physicians had sent similar emails on similar issues of concern and have not been reprimanded for those actions." (Appellant's App. at 7.) After the district court held that this allegation failed to state a plausible claim of discrimination, Plaintiff amended her complaint to allege that "[o]ther physicians, who did not share in [Plaintiff's] protected characteristics and who had not engaged in protected activity, had sent similar emails on similar issues of concern and had not received reprimands or similar discipline for having done so." (*Id.* at 108.) Her complaint then asserted, "It appeared that the reprimand was issued, because of her

-29-

protected characteristics, specifically female, from India, brown, Asian-Indian, and/or of the Hindu religion, and/or as reprisal for her having engaged in protected activity." (*Id.* at 108–09.) Her amended complaint contained no other allegations to support this claim of discrimination.

A complaint raising a claim of discrimination does not need to conclusively establish a prima facie case of discrimination, but it must contain more than "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Khalik*, 671 F.3d at 1193 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "While we do not mandate the pleading of any specific facts in particular," a plaintiff must include enough context and detail to link the allegedly adverse employment action to a discriminatory or retaliatory motive with something besides "sheer speculation." *Id.* at 1194. "[A] plaintiff should have"—and must plead—"at least some relevant information to make the claims plausible on their face." *Id.* at 1193. Thus, it is insufficient for a plaintiff to allege, for instance, that she did not receive an employment benefit that "similarly situated" employees received. *Hwang v. Kan. State Univ.*, 753 F.3d 1159, 1164 (10th Cir. 2014). A plaintiff's assertion that she is "similarly situated" to other employees is "just a legal conclusion—and a legal conclusion is never enough." *Id.* Rather, a plaintiff must allege "some set of facts"—not just legal conclusions—"that taken together plausibly suggest differential treatment of similarly situated employees." *Id.* "Pleadings that do not allow for at least a reasonable inference of the legally relevant

facts are insufficient." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231,

1236 (10th Cir. 2013) (internal quotation marks omitted).

Plaintiff's amended complaint fails to satisfy this standard. Although she asserts

that other, non-reprimanded physicians were similarly situated because they "sent similar

emails on similar issues of concern," (Appellant's App. at 108), this is too conclusory to

permit a reasonable inference of "differential treatment of similarly situated employees,"

*Hwang*, 753 F.3d at 1164. Most notably, "[f]or all we know from [Plaintiff's]

complaint," *id.*, these other physicians addressed their "similar issues of concern,"

(Appellant's App. at 108), without launching into the string of insults and accusations that

Plaintiff included in each of the emails for which she was reprimanded; lacking any facts,

we cannot assume that these physicians were similarly situated simply because Plaintiff

has asserted that they were so. *See Hwang*, 753 F.3d at 1164. Her lack of any details also

makes it impossible to parse out her numerous theories of discrimination, because she

fails to identify or describe the other physicians who sent purportedly similar emails, but

simply alleges that these physicians "did not share in [her] protected characteristics" and

then makes the conclusory assertion that the reprimand "appeared" to be based on "her

protected characteristics, specifically female, from India, brown, Asian-Indian, ***and/or*** of

the Hindu religion." (Appellant's App. at 108–09 (emphasis added).) With no additional

details, her conclusory assertion that physicians who did not share in one or more of her

protected characteristics went unpunished for sending "similar" emails is insufficient to

"indicate that racial [or other] discrimination was the plausible, rather than just the possible reason" for her reprimand. *McCoy v. Wyoming*, 683 F. App'x 662, 665 (10th Cir. 2017); *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Plaintiff's complaint thus fails to give rise to a reasonable inference of discrimination relating to the reprimand, and we affirm the district court's dismissal of this claim.

Plaintiff argues in the alternative that the district court should have granted her a second chance to amend her complaint so she could add factual allegations regarding the purportedly similarly situated physicians whose emails went unpunished. "We review the district court's decision to deny leave to amend a complaint for an abuse of discretion." *Wilkerson v. Shinseki*, 606 F.3d 1256, 1267 (10th Cir. 2010). The district court denied leave to amend in this case because Plaintiff—with the benefit of counsel—had already been granted one opportunity to amend her complaint to include facts which would give rise to a reasonable inference of discrimination. District courts have the discretion to deny leave to amend for "'failure to cure deficiencies by amendments previously allowed,'" *id.* (quoting *Duncan v. Manager, Dep't of Safety, Denver*, 397 F.3d 1300, 1315 (10th Cir. 2005)), and Plaintiff has not shown that the district court abused its discretion here. We therefore affirm the district court's discretionary decision to deny leave to further amend this claim.

## III.

For the foregoing reasons, we **AFFIRM** the district court's entry of summary judgment in favor of Defendant on Plaintiff's claims of discrimination based on unequal pay and retaliation based on her non-selection for the position as North May clinic medical director. We also **AFFIRM** the district court's dismissal of her claim of discrimination based on the reprimand she received, as well as the district court's denial of her request for a second chance to amend this claim. We **REVERSE** the district court's entry of summary judgment on Plaintiff's claim of retaliation relating to the reprimand, and we **REMAND** this claim for further proceedings before the district court.