**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JANE DOE,

     Plaintiff - Appellant,

v.

SCHOOL DISTRICT NUMBER 1,
DENVER, COLORADO, a/k/a Denver
Public Schools ("DPS"); TOM
BOASBERG, individually and in his
official capacity as superintendent of DPS;
JANN PETERSON, individually and in her
official capacity as an assistant principal
with DPS; JEANETTE SCULLEY,
individually and in her official capacity as
a dean with DPS; ERIC SINCLAIR,
individually and in his official capacity as a
dean with DPS; ANITA CURTISS,
individually and in her official capacity as
a school psychologist with DPS,

     Defendants - Appellees,

ANDY MENDELSBERG, individually
and in his official capacity as a principal
with DPS,

     Defendant.

No. 19-1293

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CV-03170-RM-STV)**
_____

Igor Raykin, Kishinevsky & Raykin, Aurora, Colorado (Michael Nolt, Kishinevsky & Raykin, Aurora, Colorado on the briefs) for Plaintiff-Appellant.

Holly Ortiz, Semple, Farrington, Everall & Case, P.C., Denver, Colorado (M. Brent Case and Brian S. Condon, Farrington, Everall & Case, P.C., Denver, Colorado on the briefs) for Defendants-Appellees.

_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Jane Doe appeals the dismissal of her Title IX claim against School District No. 1, Denver, Colorado (the District or DPS) for failure to state a claim. According to the complaint, a group of students began sexually harassing Ms. Doe after she was sexually assaulted by another student in March of her freshman year at East High School (EHS). She alleges that despite her numerous reports of the harassment to school personnel, as well as reports from teachers and a counselor, the school administration never investigated her complaints and little if anything was done to prevent the harassment from continuing. She stopped attending regularly scheduled classes about 14 months after the assault, and she transferred to a different school after completing her sophomore year. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse.[1]

_____

[1] The original complaint alleged claims against a number of other defendants and raised several other claims. But only the Title IX claim against the school district is pursued on appeal.

2

## I.     THE COMPLAINT

Because this appeal is taken from an order granting the District's motion to dismiss, we "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to [Ms. Doe]." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (internal quotation marks omitted).  We ignore factual assertions by the District unless they are based on allegations in the complaint or on other sources proper to consider on a motion to dismiss.  *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (on motion to dismiss complaint, court may consider complaint and "(1) documents that the complaint incorporates by reference, (2) documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity, and (3) matters of which a court may take judicial notice" (internal citations and quotation marks omitted)).  The complaint alleges the following events:

Jane Doe was a 14-year-old student in her first year at EHS when she was sexually assaulted by a male classmate, referred to as "Student 1," at his parents' home on a Saturday evening.  The following Monday, March 14, 2016, Ms. Doe reported the assault to Jeanette Scully, an EHS dean with disciplinary authority.  Dean Scully sent Ms. Doe to see a school psychologist, Anita Curtiss.  Ms. Doe's parents were contacted and came to EHS to meet with Dean Scully and Ms. Curtiss.  They were told "that the charges would be difficult to prove and doing so would be difficult on the family," Aplt. App. at 17, and were discouraged from filing charges.  Although they declined to press charges at the time, citing their concern for Student 1, they did request that the assault be formally

3

documented in school files.  After Ms. Doe's report, the school warned her brother (also a student at EHS) not to retaliate against Student 1.  Neither Ms. Curtiss nor Dean Scully reported the assault to the Denver Police Department school-resource officer assigned to EHS.

The next day Ms. Doe told Dean Scully that she was facing "backlash from her peers, who[] had heard about the assault," and Dean Scully advised her to forget about the assault and not tell anyone.  *Id.*  Ms. Doe met with Ms. Curtiss again on March 17 because of "retaliation at school based on her rape report."  *Id.* at 18.  She was experiencing "fallout of her friendships," *id.*, "anxiety about being at school," "fears for the future," "nightmares," and "lack of sleep," *id.* at 19.  Ms. Curtiss reviewed limitations (not described in the complaint) on interactions with Student 1.  (The District's brief on appeal asserts that EHS imposed a "no-contact" order between Ms. Doe and Student 1 immediately after the assault was reported, but the complaint does not allege that and the District provides no citation to the record supporting the assertion or any explanation of why we can consider the assertion.)  Throughout the week, Ms. Curtiss "counseled" Ms. Doe, telling her that "some things are just more traumatizing for others," that she should "find new friends," and that she would be disciplined for harassment if she contacted Student 1.  *Id.*

The next week, on March 23, one of Ms. Doe's friends told Ms. Curtiss that Ms. Doe had started to cut herself.  Ms. Curtiss asked Ms. Doe to complete a safety-plan form and assured her that they would have weekly check-ins about her safety, though Ms. Doe alleges that these weekly check-ins never occurred.

4

On April 6, Ms. Doe met again with Ms. Curtiss and told her that she was still experiencing conflicts with her peers. Ms. Curtiss gave her advice about how to manage the conflicts. Also on April 6, one of Ms. Doe's teachers emailed Ms. Curtiss to say that Ms. Doe "had a rough week with the gossip around her." *Id.* at 20. Two days later, Ms. Curtiss emailed Dean Scully about Ms. Doe's ongoing problems with Student 1 and to tell her that Ms. Doe was having problems with harassment by Student 1's friends, which included the friends telling Ms. Doe that "[w]e took a vote and we all agree you'll lose your virginity first." *Id.* Ms. Curtiss asked Dean Scully to "meet with Student 1 to reiterate that this issue is between Ms. Doe and himself," and that "his friends defending him cannot . . . verbally harass Ms. Doe." *Id.* (brackets omitted). Dean Scully indicated that she would talk with Student 1. No investigation was conducted or disciplinary action taken by the school against Student 1 or the harassers during the school year ending in June, although the complaint does not identify any additional reports to school officials by Ms. Doe before school ended. Ms. Doe does allege one incident of harassment during the summer, when one of Student 1's close friends (Student 3) contacted her over Facetime and asked if she wanted to "sexually experiment with him." *Id.* at 23.

When school was back in session, "there were additional reports [in early September] that Ms. Doe was being bullied as a result of the rape," and "reports [in late November] indicating that Ms. Doe had ongoing conflicts with other students." *Id.* at 21. And in December she told Ms. Curtiss that "things at EHS had only gotten worse for her, and that she was considering switching schools." *Id.* at 22. Ms. Curtiss told her that "if she switched schools, then she would only be running away from her problems." *Id.*

5

On January 19, 2017, Ms. Doe reported through an anonymous system called "Safe2Tell" that she was being bullied. Every such report was supposed to be copied to the EHS principal. The report, which is included in the record on appeal, stated that "[c]aller received information about sophomore [Student 3] that has nude photographs of female students on a phone app . . . . [Student 3] has used the photos to blackmail these students." *Id.* at 127. (The report did not include any information about how Student 3 got the nude photographs). In response to the report, Eric Sinclair, another dean with disciplinary authority at EHS, and Janet Peterson, an assistant principal, met with Ms. Doe on January 20. She told them her experience from the time of the sexual assault. She reported that she had been subjected to "constant bullying and harassment . . . from the boys in the sophomore class at EHS." *Id.* at 22. She said there was a group of students who would "make drawings of [her] telling her to kill herself, call her names, start rumors about her and make rape jokes about Student 1 to [her]." *Id.* (capitalization and original brackets omitted). One of the students would "constantly stare at Ms. Doe [and] smirk at her," *id.*, and Student 3 "shoved her down at lunch" off campus and "called her a dirty slut," *id.* at 23 (internal quotation marks omitted). Ms. Doe identified a group of five boys who "pulled on her backpack all the time and would draw pictures of her killing herself." *Id.* Dean Sinclair and Ms. Peterson again called Ms. Doe's parents, who came to campus to discuss their concerns about bullying. No disciplinary action was taken against any of the boys and the harassment continued.

A week later Ms. Doe met with Dean Sinclair and Elisa Spratt, a school psychologist, about "safety concerns." *Id.* at 24. The Dean said that there was no "hard

evidence" of any of the bullying Ms. Doe had alleged. *Id.* (internal quotation marks omitted). In response, Ms. Doe gave him "copies of numerous pictures and social media exchanges," and the names and phone numbers of the students who were harassing her. *Id.* Dean Sinclair "briefly glanced" at what Ms. Doe gave him before filing it away. *Id.* There was no investigation of the harassment or disciplinary action against the offending students.

The school completed a suicide-risk report on Ms. Doe on January 25. It noted the alleged rape and incorrectly stated that it had been reported to the police. It also documented that "Ms. Doe felt everyone got mad at her for reporting Student 1," that "she wasn't sleeping well and thought about overdosing on sleeping pills," that "she wrote a goodbye letter to her older sister," that "she was having nightmares thinking about Student 1 in her room," and that she "had lost interest in self-preservation." *Id.* (brackets, capitalization, and internal quotation marks omitted). The report indicated that "Ms. Doe could have been suffering from an emotional disability." *Id.* Following the report, a school counselor, Lindsay Vesceri, spoke with Ms. Doe and her father about "concerns," and on January 31, Ms. Vesceri emailed Dean Sinclair about "harassment against Ms. Doe." *Id.* at 25. Dean Sinclair replied that he would "speak with the students." *Id.*

Ms. Doe and Dean Sinclair met several more times in late January and early February to discuss ongoing bullying and harassment. She told him that she was being physically threatened, including being told that "she should watch her back if she 'does not want to die,'" and that she "would be 'beat up.'" *Id.* One of her friends was also

7

being threatened by Student 3, who told her not to have lunch with Ms. Doe again or "it would be 'bad for her.'" *Id.* Dean Sinclair discussed these incidents with Ms. Doe and her parents and said that he "could not do anything about it and that 'being an asshole isn't a crime.'" *Id.* At this point Ms. Doe was eating lunch by herself in teachers' rooms or the counselors' office and was leaving school through the back entrance because she was afraid of the students who were threatening her.

On April 7 one of Ms. Doe's teachers, Sarah Rasay, emailed Dean Sinclair to tell him that Ms. Doe had been harassed by a group of students since an incident the prior year, that she had received a Snapchat message on her phone from the harassing students that said "Consent is a myth," that "someone from the group had threatened to beat her up," and that she did not feel safe or protected at school and did not "go outside at lunch to avoid these students." *Id.* at 26. Later that month Ms. Doe "was the recipient of a very harsh and embarrassing Instagram post," which caused her to have a "full breakdown," including hitting her head against the wall so hard that she suffered a concussion. *Id.* She did not go to school the next day.

A few weeks later Ms. Rasay forwarded to an EHS assistant principal, Joe Glover, her April 7 email about her concerns for Ms. Doe's safety. Ms. Doe then met with Ms. Rasay and Ms. Vesceri, both of whom were concerned that Dean Sinclair was not "taking proper action to stop the harassment." *Id.* at 26–27. The three of them met with Vince Valdez, another disciplinary dean at EHS, and Ms. Doe's mother. They discussed a safety plan for Ms. Doe but did not address stopping harassment by Student 1 or the other boys. At the meeting it appeared that EHS had not documented in Ms. Doe's official file

8

the sexual assault or any of the bullying and retaliation. Ms. Doe's mother told Ms. Vesceri that her daughter would not be returning to EHS. The day after the meeting Ms. Doe went to the emergency room because of a panic attack.

Several days later Ms. Doe's parents asked Ms. Vesceri why her file contained no information regarding the assault and bullying. Ms. Vesceri responded that "she and other faculty members were instructed by EHS officials not to be detailed in file reports in case one of them ever has to appear in court." *Id.* at 27.

Although Ms. Vesceri had told Ms. Doe's mother that if Ms. Doe left the high school her teachers would probably just freeze her grades "and award her full credit because she was such a good student," EHS principal Andy Mendelsberg later told Ms. Vesceri that he was opposed to Ms. Doe's leaving EHS and that he "would not allow her to get full credit for her grades." *Id.* At a meeting on May 4 between Ms. Doe's parents and Mr. Mendelsberg, he told them that he was unaware of the reported sexual assault or any of the subsequent bullying and harassment. He said that if the assault and harassment "was that bad, she wouldn't have been able to maintain those grades." *Id.* at 28. The parties agreed that for the remaining six weeks of the school year, Ms. Doe would complete her classwork by coming to campus before and after regularly scheduled classes at least three times per week. Under this arrangement Ms. Doe came in as early as 5:30 a.m. to complete her work before classes started, or came in at 5 p.m. and stayed as late as 7:00 p.m. Nonetheless, she would still "on occasion run into her harassers, including Student 1." *Id.* at 29 (brackets and capitalization omitted). And she was required to take

9

most of her final exams in classrooms in which her harassers were present. Ms. Doe finished the school year with a 4.0 GPA, and then transferred to a different high school.

During the summer of 2017, following an unrelated incident at EHS, a parent of another EHS student encouraged the DPS superintendent to reach out to Ms. Doe's parents because she had heard that EHS had mishandled Ms. Doe's reports that she was being harassed. That same day, the general counsel for DPS left Ms. Doe's father a voicemail "regarding the problematic culture at EHS with respect to responding to claims of sexual assault and bullying." *Id.* at 30–31. On November 1, DPS assigned to Ms. Doe's matter an attorney who told Ms. Doe's father that "multiple parents had come forward regarding the cultural problem created by [former principal] Mendelsberg and the EHS administration," and that there was a new principal at EHS. *Id.* at 31.

Ms. Doe filed a police report about the assault by Student 1 on November 14, 2017. The next month the detective assigned to her case met with Ms. Peterson, who said that there were no computer records showing that Student 1 had been accused of sexual assault or other misbehavior. In 2018, Student 1 pleaded guilty to felony sexual assault with force.

## II.    DISCUSSION

Title IX of the Education Amendments of 1972 mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). A school that receives federal funding may be held liable for damages that are caused by its deliberate

indifference to student-on-student sexual harassment that is "so severe, pervasive, and objectively offensive" that it deprives the victims of equal access to educational resources, opportunities, or benefits. *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999); *see id.* at 649– 50 ("sexual harassment is a form of discrimination for Title IX purposes"). To establish a Title IX claim of deliberate indifference to student-on-student sexual harassment, the plaintiff must prove that the school "(1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1246 (10th Cir. 1999).

The district court granted the defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss the action for failure to state a claim because it determined that Ms. Doe had failed to plausibly allege that she was harassed on the basis of sex, that the harassment was severe or pervasive, or that DPS was deliberately indifferent to the alleged sexual harassment. Ms. Doe challenges each ruling in her opening brief. In its answer brief, DPS argues that we can also affirm on the alternative ground that Ms. Doe failed to plausibly allege that the harassment deprived her of educational benefits or opportunities.

We now turn to the issues raised by the parties.

### A.    Standard of Review

We review de novo the district court's ruling on a Rule 12(b)(6) motion to dismiss, "accepting as true all well pled facts and viewing those facts in the light most favorable to Plaintiffs." *Farmer v. Kan. State Univ.*, 918 F.3d 1094, 1102 (10th Cir.

11

2019).  A complaint cannot survive a motion to dismiss unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A complaint is "plausible on its face" if its factual allegations allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  We have interpreted this standard to be "a middle ground between heightened fact pleading . . . and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action[.]" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotation marks omitted).  "[S]pecific facts are not necessary," but "some facts are."  *Id.* at 1193 (brackets and internal quotation marks omitted).

### B.    Harassment on the Basis of Sex

The district court decided that Ms. Doe failed to allege that the harassment she suffered was on the basis of sex.  It reasoned that the facts alleged in the complaint "suggest that other students harassed her because they learned she had accused Student 1 of sexually assaulting her" and there was no allegation that "DPS responded differently when a male student made a similar accusation against another student at EHS nor any indication that it would have done so."  *Doe v. Sch. Dist. No. 1, Denver, Colo.*, Civil Action No. 1:18-cv-03170-RM-STV, 2019 WL 3425236, at *4 (D. Colo. July 30, 2019).

On appeal Ms. Doe argues that the harassment was "on the basis of sex" because the harassment was linked to the sexual assault by Student 1 and much of the harassment

12

involved sexually charged comments. For legal support she relies on an unpublished Second Circuit opinion which held that "'[a] reasonable factfinder could conclude that when a fourteen-year-old girl reports a rape and then is persistently subjected by other students to verbal abuse that reflects sex-based stereotypes and questions the veracity of her account, the harassment would not have occurred but for the girl's sex.'" Aplt. Br. at 14 (quoting *Doe v. East Haven Bd. of Educ.*, 200 F. App'x. 46, 48 (2d Cir. 2006)).

For the factual predicate of her argument, Ms. Doe points to her complaint's specific allegations that Student 1 had raped her and that his associates harassed her by calling her a "dirty slut," making rape jokes about her assailant, telling her that she would be the first to lose her virginity, and sending her a group Snapchat message that "[c]onsent is a myth." There are also allegations that Student 1's associates engaged in sex-neutral but hostile conduct toward her, such as pulling on her backpack, drawing pictures of her killing herself, telling her she should kill herself, and threatening her with physical violence.

DPS responds that "[h]arassment for reporting misconduct is not the same as harassment because of gender," Aplee. Br. at 12, and that Ms. Doe was not harassed "on the basis of sex" because her complaint alleges that the harassment was motivated by retaliatory animus toward Ms. Doe for reporting Student 1 to school authorities for assaulting her. This argument relies on our opinion in *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996). The plaintiff in that case had been sexually assaulted by his football teammates as part of a hazing ritual in which he was taped naked to a towel rack in the locker room and a female student was brought into the locker room to view him while his

13

teammates looked on. *See id.* at 1230. After he reported the incident, the school district responded by cancelling the football team's last game of the season, which caused him to be "branded as the cause of the football team's demise," "threatened[,] and harassed." *Id.* He claimed that school administrators discriminated against him by "fail[ing] properly to investigate the taping incident and to take disciplinary action against the students involved, creating a hostile environment." *Id.* at 1232. We held that his claim failed because the discriminatory actions against him were not on the basis of sex: "[T]he facts as alleged tend to show only that [the plaintiff] was treated as he was because others felt he 'betrayed' the team by reporting the incident to the relevant authorities and by failing to apologize." *Id.* at 1233. DPS says that just like the harassment of the plaintiff in *Seamons*, the harassment of Ms. Doe in this case was motivated by her reporting the sexual assault to school authorities and not her sex.

In our view, Ms. Doe has adequately alleged discrimination on the basis of sex. First, we believe that it is a factual question whether the harassment of Ms. Doe was exclusively motivated by a desire to retaliate for her reporting that she had been sexually assaulted. In particular, a factfinder could decide that the comments that were sexual in nature—such as those relating to consent and the loss of her virginity—were harassment based on sex that went beyond gender-neutral harassment motivated only by a desire to retaliate against one who reports misconduct.

Second, *Seamons* is readily distinguishable. It was a narrow holding under unique, peculiar facts. The case presented a limited claim that did not challenge the initial taping incident nor did it allege any sexual content in the School District's

14

response other than a general nonspecific conclusion that the School District hypothetically might have handled a female athlete's complaint differently.

Third, and dispositively, after *Seamons* was decided, the Supreme Court held, directly contrary to what the District reads into *Seamons*, that retaliation for reporting sex discrimination comes within the meaning of the statutory language prohibiting discrimination "on the basis of sex." *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005). The factual question described above—whether the harassment was motivated solely by the report of the sexual assault—is therefore irrelevant to the dispute between the parties. As *Jackson* explained:

> Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment. Moreover, retaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.

*Id.* at 173-74 (citations omitted). An allegation that the plaintiff was harassed for reporting misconduct can therefore suffice to state a claim for discrimination on the basis of sex if the misconduct reported is itself sex discrimination.

Applying *Jackson* to the case before us, the sexual assault that Ms. Doe complained about was an act of sex discrimination. *See Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) ("Physical sexual assault has routinely been prohibited as sexual harassment under Title VII."); *see also id.* at 1065–66 (collecting cases holding that physical sexual assault is sexual harassment). Hence, any harassment of her that was motivated by retaliatory animus for her complaint was "an intentional

15

response to the nature of [her] complaint" and was therefore "discrimination 'on the basis of sex.'" *Jackson*, 544 U.S. at 173–74; *see Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695 (4th Cir. 2018) ("[W]e are satisfied that an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment."); *cf. Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1166–67 (9th Cir. 2017) ("[W]hen an employer acts in a way that effectively condones or ratifies a rape or sexual assault and its effects, a jury may reasonably infer that the employer itself is discriminating because of sex." (internal quotation marks omitted)).

Thus, in light of *Jackson*, we can only conclude that Ms. Doe's complaint adequately alleges that her harassment by other students was on the basis of sex.

### C.    Severe, Pervasive, and Objectively Offensive

In *Davis* the Supreme Court declared that to be actionable under Title IX, the sex-based harassment by fellow students must be "so severe, pervasive, and objectively offensive, and . . . [must] so undermine[] and detract[] from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." 526 U.S. at 651. A reviewing court may consider "a constellation of surrounding circumstances, expectations, and relationships including, but not limited to, the ages of the harasser and the victim and the number of individuals involved[.]" *Id.* (citation and internal quotation marks omitted).

Ms. Doe's complaint alleges that she was subjected to harassment by her peers more or less continuously from the time she reported Student 1 until she stopped attending regularly scheduled classes more than a year later. She says that she was called

16

a "dirty slut," Aplt. App. at 23; blackmailed with nude photographs; told that "[c]onsent is a myth," *id.* at 26, and that she would be the first to lose her virginity; and threatened with physical violence. She also alleges that a group of boys would start rumors about her, make rape jokes about her assailant to her, pull on her backpack, tell her to kill herself, and draw pictures of her killing herself.

The district court ruled that it was "not persuaded that the few specific instances described in the complaint are adequate to show harassment that was pervasive and severe." *Doe*, 2019 WL 3425236, at *5. It said that the allegations relating to the nature of the harassment were, for the most part, too conclusory to support a reasonable inference that DPS was liable for misconduct. We respectfully disagree.

"A plaintiff should have—and must plead—at least some relevant information to make the claims plausible on their face." *Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019) (brackets and internal quotation marks omitted). But the plaintiff is not required to prove her case at the motion-to-dismiss stage. *See id.* at 1274 ("A complaint raising a claim of discrimination does not need to conclusively establish a prima facie case of discrimination."). Further, matters of degree—such as severity and pervasiveness—are often best left to the jury. Thus, we have observed that "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact," *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999); and it is even less suited for dismissal on the pleadings.

These considerations are particularly potent here. Ms. Doe alleges that she was continuously harassed for a number of months. The complaint need not provide details

17

of the time, place, offender, and precise statement for every incident. Describing more than half a dozen of the types of things said to her, apparently repeatedly, can suffice, particularly when combined with her allegations that she reported ongoing and continuous harassment to school personnel almost monthly from the time of the sexual assault to the time she left the school.

Adding to the evidence that the harassment was severe and pervasive are the allegations regarding the impact of the harassment on Ms. Doe and the evaluations of third parties. In particular, she alleges that by the spring semester of 2017 she was going to great lengths to structure her time at EHS to avoid contact with the students who were harassing her (eating lunch in the counselor's office or teachers' classrooms, using the back doors instead of the main entrance). And she alleges that two teachers and one counselor were sufficiently concerned to contact school administrators for their help. *Cf. Asebedo v. Kan. State Univ.*, 559 F. App'x 668, 671 (10th Cir. 2014) (allegation that employer's own internal investigations determined that the plaintiff had been subjected to a hostile environment supported a reasonable inference that he was, in fact, subjected to a hostile work environment). Such reactions would be uncommon responses to minor teasing or banter.

Further, the specifics that Ms. Doe provides (being called a dirty slut, being told to kill herself, etc.) support an inference that the harassment was objectively offensive. In our view, Ms. Doe has adequately alleged that her harassment was severe, pervasive, and objectively offensive.

18

### D.     Denial of Educational Benefits

To state a claim for relief under Title IX, the plaintiff must allege that she was "effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.  Even though the district court did not rule on this issue, DPS argues that the court's judgment can be affirmed on the alternative ground that Ms. Doe's complaint fails to adequately allege denial of such access.  We disagree.

The District relies on the Seventh Circuit's decision in *Gabrielle M. v. Park Forest Chicago Heights, Illinois School District*, 315 F.3d 817, 823 (7th Cir. 2003), which upheld the denial of relief when "there [was] no evidence that [the plaintiff] was denied access to an education" since "she was diagnosed with some psychological problems, [but] the record shows that her grades remained steady and her absenteeism from school did not increase."  But that is not our case.  The complaint alleges that the harassment became so intolerable that Ms. Doe could not attend classes at the school.  She worked at home, coming to school only to perform assignments before regular classes began and after classes had ended.  We are somewhat surprised that the District so devalues classroom instruction and experience that it argues that their denial is not a denial of access to education.  Yes, Ms. Doe maintained a 4.0 average.  Apparently, she is quite bright.  Does that mean that she would have derived no benefit from the instruction provided by her teachers?  And there is certainly a body of thought that the socialization from attending school with peers is an important, perhaps essential, advantage of the school experience.  The District's argument on this issue is unpersuasive.  *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 699–700 (4th Cir. 2007) (en banc) (plaintiff student may

19

have been deprived of access to educational opportunities or benefits even though her grades slightly improved); *but see id.* at 717–19 (Niemeyer, J., dissenting).

### E.    Deliberate Indifference

The above analysis establishes that Ms. Doe has adequately alleged that harassment on the basis of sex by fellow students (including harassment that was retaliation for her reporting the sexual assault by Student 1) was sufficiently severe and pervasive to deprive her of educational benefits.  The remaining issue on appeal is whether the complaint adequately alleges facts establishing that the District is liable for responding improperly to the student harassment.[2]

"[R]ecipients of federal funding may be liable for 'subjecting' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646–47 (original brackets omitted); *see Feminist Majority Found. v. Hurley*, 911 F.3d 674, 695 (4th Cir. 2018) ("[W]e are satisfied that an educational institution can be liable for acting with deliberate indifference toward known instances of student-on-student retaliatory harassment.").  The school is deliberately indifferent if its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648.  This "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.*  Indeed, "courts should

---

[2]  We note that there is no claim that the District was retaliating against Ms. Doe for her reports of the sexual assault or the student harassment.

20

refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*; *see Stiles v. Grainger Cty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) (although continuing harassment by fellow students required plaintiff student to transfer to another school, school was not liable because its prompt, tailored, and repeated responses to the harassment—including interviewing the victim, other students, and teachers, and disciplining students with verbal warnings and suspensions—established that it was not deliberately indifferent); *see also Porto v. Town of Tewksbury*, 488 F.3d 67, 75 (1st Cir. 2007) (school was not deliberately indifferent since it "reasonably believed that it had been successful in stopping" the inappropriate behavior).

The district court held that the response of EHS personnel was not clearly unreasonable because Ms. Doe was provided counseling services; the offending students were referred to EHS deans "on multiple occasions"; and although harassment continued after Ms. Doe's reports, EHS was not required to eliminate harassment. *Doe*, 2019 WL 3425236, at *5. Again, we respectfully disagree.

The District commendably provided counseling for Ms. Doe. But it is not enough to try to help a student cope with the misbehavior of other students. *See Hurley*, 911 F.3d at 690 ("[U]niversity administrators listening to students' reports of harassment and threats is an important step in seeking to rectify a sexually hostile environment. But the mere act of listening to students is not a remedy in and of itself."). Deliberate indifference may be shown by a failure to act to halt the misbehavior. *See Davis*, 526 U.S. at 654. According to Doe's complaint, the school's only response in that regard was that administrators said they would speak with the students who were harassing her in the

21

spring of 2016 when she first reported that she was being harassed and again in early 2017 after she filed her Safe2Tell report. The complaint does not say whether the administrators followed up on their promises and, if so, what they said. Discovery may be necessary for Ms. Doe to find out. But even without that information, her complaint contains sufficient allegations to support an inference of deliberate indifference.

First, she alleges continual harassment despite her repeated reports to school authorities. Thus, the authorities knew that what they had been doing (if anything) had not sufficed. Failure of authorities to try something else can show deliberate indifference. *See Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) ("Although talking to the offenders produced no results, [the school] continued to employ this ineffective method. . . . [O]nce [the school] had knowledge that its response was inadequate, it was required to take further reasonable action in light of the circumstances to avoid new liability."); *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) ("[I]f [the educational institution] learns that its measures [to halt harassment] have proved inadequate, it may be required to take further steps to avoid new liability."); *cf. Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 668–71 (2nd Cir. 2012) (in Title VI claim for discrimination in education on the basis of race, even immediate disciplinary actions against students engaged in harassment, if known to be ineffective, can be clearly unreasonable under the circumstances).

Second, Ms. Doe alleges that school authorities conducted no investigation. *See Davis*, 526 U.S. at 654 ("[P]etitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board, which made no effort whatsoever either

22

to investigate or to put an end to the harassment."); *Murrell*, 186 F.3d at 1248 ("[C]omplete refusal to investigate known claims of the nature advanced by [the victim], if true, amounts to deliberate indifference."). It would be a different story if the District had referred the matter to another institution, such as the police, to investigate, as in *Rost ex rel. K.C. v. Steamboat Springs RE-2 School Disrict*, 511 F.3d 1114, 1121 (10th Cir. 2008). But it did no such thing. On the contrary, according to the complaint, school authorities even forcefully encouraged Ms. Doe and her parents not to report to the police the rape by Student 1, who later pleaded guilty to sexual assault with force.

Third, the administrators' refusal to take Ms. Doe's complaints seriously is reflected in their failure to document them. Nothing regarding the harassment was recorded in Ms. Doe's school file nor did Student 1's file have any reports of misbehavior, not even the sexual assault.

Fourth, this circumstantial evidence of deliberate indifference is supported by direct evidence alleged in the complaint: when Ms. Doe and her parents complained to Dean Sinclair in late January or early February of 2017 that "nothing was being done to address the bullying and harassment," he responded that "he could not do anything about it and that 'being an asshole isn't a crime.'" Aplt. App. at 25. QED.

In our view, Ms. Doe has adequately pleaded the deliberate-indifference element of her claim. She should be given the opportunity to show that she has evidence supporting her allegations.

23

### III.  CONCLUSION

We **REVERSE** the district court's order dismissing Ms. Doe's Title IX claim against DPS and **REMAND** for further proceedings.

19-1293, *Doe v. School District Number 1, et al.*

**TYMKOVICH**, Chief Judge, concurring.

While I agree with the majority that the district court erred in granting DPS's motion to dismiss for failure to state a claim, I write separately to express my disagreement with the majority's conclusion that defendants could be found liable under Title IX for failing to police student-on-student retaliatory conduct. But because Doe's second amended complaint plausibly alleges a Title IX claim for sexual harassment under *Davis*, I concur. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

Title IX prohibits educational institutions receiving federal funds from discriminating on the basis of sex. 20 U.S.C. § 1681. In *Franklin,* the Supreme Court concluded Title IX is enforceable through an implied private right of action for damages if the Title IX violation is intentional. *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 74–75 (1992). *Franklin* also held that "sexual harassment" is a form of sex-based discrimination within the meaning of Title IX. *Id.* at 75. *Davis* went further, holding that a funding recipient could be liable under Title IX for student-on-student sexual harassment under a "direct liability theory" where a school's "deliberate indifference" effectively "subjects its students to harassment." *See Davis* at 630 (internal quotation marks omitted). Although Title IX, unlike Title VII, does not include express language prohibiting retaliation, in *Jackson*, the Court concluded "Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination,

because such retaliation is intentional discrimination on the basis of sex." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175–78 (2005). (internal quotation marks omitted).

This court regularly borrows from Title VII in resolving Title IX claims. Indeed, we have explicitly held "Title VII . . . is the most appropriate analogue when defining Title IX's substantive standards . . . ." *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir. 1993) (quoting *Mabry v. State Bd. of Cmty. Colls. and Occupational Educ.*, 813 F.2d 311, 314 (10th Cir. 1987)). And in the wake of *Jackson*, various courts have applied the Title VII retaliation framework to Title IX retaliation claims. *See, e.g.*, *Milligan v. Bd. of Trs.,* 686 F.3d 378, 388 (7th Cir. 2012), *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012), *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 91–92 (2d Cir. 2011), *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).

Thus, while we have not addressed student-on-student retaliation in the Title IX context, our cases dealing with co-worker retaliatory conduct in the Title VII context are instructive. In *Gunnell*, we held that "an employer can only be liable for co-workers' retaliatory harassment [under Title VII] where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998). We emphasized that such a test

2

was appropriate because it is the *employer's* intentional conduct or acquiescence, not that of a third-party, that exposes an employer to Title VII liability for sex-based discrimination. *Id.* at 1263, 1265. Title IX likewise provides a cause of action for the "intentional conduct" of a *funding recipient*.

*Davis* begins from the premise that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis* at 640. When the misconduct at issue is not that of the recipient itself, but of a peer student, liability only attaches to the recipient when a school's "own deliberate indifference effectively caused the discrimination." *Id.* at 642–43 (internal quotation marks omitted). This "deliberate indifference to known acts of [student] harassment—amounts to an intentional violation of Title IX, capable of supporting a private damages action[.]" *Id* at 643. In *Jackson*, the Court determined that Title IX's anti-discrimination provisions encompassed an implicit anti-retaliation component, noting that "retaliation presents an even easier case than deliberate indifference [because i]t is easily attributable to the funding recipient and it is always—by definition—intentional." 544 U.S. at 183. In other words, I disagree with the majority's decision to bootstrap the *Davis* "deliberate indifference" into the realm of Title IX retaliation through a reading of *Jackson*, which involved *direct* retaliation by the funding recipient. *See Jackson*, 544 U.S. at 183.

Instead, I would borrow from the *Gunnell* test and ask whether school officials acted with the intent to either orchestrate, or condone and encourage, student-on-student

3

retaliation. If they did, the retaliation at issue would be "attributable to the funding recipient" and would expose the school to private liability under Title IX. *See Jackson* at 183. Doe has not alleged any such facts.

Finally, the distinction between harassment and retaliation claims is relevant because proof of actionable harassment requires evidence that the sexual harassment was sufficiently severe or pervasive as to interfere with a student's access to educational programs, *Davis* at 650, whereas proof of actionable retaliation would likely require evidence the harassment was

"materially adverse" in that it would deter a reasonable student from opposing unlawful sex discrimination. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), s*ee also Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (applying *Burlington's* "material adversity" test to a Title IX retaliation claim), *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 695 (4th Cir. 2018) (same), *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 868–69 (9th Cir. 2014) (same), *Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 911–12 (11th Cir. 2013) (same).

In summary, Doe has plausibly alleged DPS acted with deliberate indifference to known acts of direct sex-based harassment by her student peers. The motivation of Doe's peers is not relevant to the inquiry of whether DPS's response to the harassment was "clearly unreasonable in light of known circumstances." *See Davis* at 648.