FILED
United States Court of Appeals
Tenth Circuit

April 14, 2021

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOSHUA O. THOMAS,

    Plaintiff - Appellant,

v.

FARMERS INSURANCE EXCHANGE,

    Defendant - Appellee.

No. 20-3076
(D.C. No. 2:18-CV-02564-DDC)
(D. Kansas)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **MURPHY**, and **McHUGH**, Circuit Judges.
_____

Farmers Insurance Exchange ("Farmers") employed Joshua Thomas as a service

advocate in its Olathe, Kansas, office. Mr. Thomas is gay and male. He claims Farmers

discriminated against him by not selecting him for an Account Underwriter Specialist

("AU") position, retaliated against him by issuing a final warning when he filed a

discrimination complaint, and then retaliated against him again by terminating his

employment when he filed this lawsuit. The district court granted Farmers' motion for

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

summary judgment and Mr. Thomas appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual History*

Farmers is a Nevada corporation registered to do business in Missouri, with a service center in Olathe, Kansas. On March 9, 2015, Farmers hired Mr. Thomas to work as a service advocate at the Olathe service center. Farmers originally hired Mr. Thomas as a Service Advocate II, and promoted him to Senior Service Advocate in April 2016. In both positions, Mr. Thomas was responsible for handling calls about policies and accounts. Mr. Thomas had three direct supervisors over the course of his employment with Farmers: he reported to Jeanann Sebers from March 2015 to March 2018, Jarrod Shelton from March 2018 to September 2018, and Curt Sims from September 2018 until his termination in October 2018.

According to his affidavit, Mr. Thomas "did not conform to stereotypes of how males behave and act[ed] in a way that was noticeable to [his] coworkers" during his employment with Farmers. App., Vol. III at 538. This included wearing clothing which, "though professional, was very stylish and fashionable"; being "very attentive to [his] appearance and hygiene and ke[eping his] desk very tidy"; and "socializ[ing] primarily with [his] female co-workers while most male co-workers socialized with other male co-workers." *Id.* at 538–39.

## 1. Performance History

Mr. Thomas's supervisors periodically monitored and reviewed his performance as a Senior Service Advocate. The record reflects interactions between Mr. Shelton and Mr. Thomas beginning in March 2018 regarding Mr. Thomas's demeanor during service calls. During these "coaching sessions," Mr. Shelton instructed Mr. Thomas to stop exhibiting obvious frustration, interrupting others, and using a condescending tone during calls with agents.[1] Numerous instances of these coaching sessions appear in Mr. Shelton's weekly reports. *See* App., Vol. II at 297 ("I've been working very closely with [Mr. Thomas] on . . . how he tends to let his aggression show when frustrated" – email dated March 21, 2018); *id.* at 299 ("I'm still working closely with [Mr. Thomas] on his verbal skills toward agents. This is one of my highest priorities at the moment" – email dated March 31, 2018); *id.* at 301 ("Had a very in-depth conversation yesterday with [Mr. Thomas] with how he gets frustrated on the phone" – email dated April 4, 2018). In a May 10, 2018, email, Mr. Shelton reported he had "coached [Mr. Thomas] as much as I can, so now I'm in an observation period to see if he responds to the coaching or keeps with his ways and this will determine my next steps of corrective action." *Id.* at 319.

Mr. Thomas also received some positive feedback over this period. For example, on March 31, 2018, Mr. Shelton wrote to Mr. Thomas: "I appreciate how open you are to

---

[1] Mr. Thomas's prior supervisor, Ms. Sebers, also coached Mr. Thomas about his tone and demeanor in a phone call in January 2018.

feedback and I know you're going to do well in this area." App, Vol. III at 659. And on May 1, 2018, Ms. Canton described a coaching experience with Mr. Thomas as particularly positive.

## 2. Application for AU Position

On April 2, 2018, Mr. Thomas applied to fill one of two AU vacancies in Phoenix, Arizona. Farmers accepted only internal applications and ten Farmers' employees applied. Mr. Thomas was the only candidate from Olathe. Eight of the other candidates already worked in Phoenix and the final candidate worked in Round Rock, Texas.

John Radliff, a Personal Lines Field Underwriting Manager with Farmers, was the person making the hiring decisions for the AU positions. Mr. Radliff worked in Olathe. While the positions were open, Mr. Shelton, Mr. Thomas's supervisor at the time, mentioned to Mr. Radliff that Mr. Thomas could easily move to Phoenix because Mr. Thomas was single, had no children, and owned a condominium he could sell. Mr. Shelton later described this conversation to Mr. Thomas as an attempt to bolster Mr. Thomas's candidacy.

Along with another manager, Mr. Radliff interviewed all ten candidates. An interview guide contained a set of competencies to be explored during the interviews: "Teamwork; Decisiveness; Persuasiveness; Customer Service Skills/Customer Orientation; Manage Change." *Id.* at 646. In his deposition, Mr. Radliff testified he "was looking for three characteristics[:] . . . decisiveness, customer service, and . . . leadership or teamwork." App., Vol. I at 222. Mr. Radliff checked a box indicating Mr. Thomas had demonstrated teamwork and leadership during his interview. Ultimately, Mr. Radliff did

not select Mr. Thomas for either position; he instead promoted Brittany Harris and James Parchment Chavez. Both Ms. Harris and Mr. Chavez were already located in Phoenix. Ms. Harris is female, and Mr. Chavez is gay. Mr. Radliff was unaware of Mr. Chavez's sexual orientation at the time of the promotion. And there is no evidence that Mr. Radliff knew Mr. Thomas's sexual orientation when Mr. Radliff filled the AU positions.

After learning he had not been selected for an AU position, Mr. Thomas asked Mr. Radliff for feedback. Mr. Radliff suggested that he and Mr. Thomas meet in person, rather than communicate by email. The two met on April 23, 2018, and Mr. Thomas surreptitiously recorded the meeting.[2] Mr. Radliff told Mr. Thomas that although Mr. Thomas's interview went well, Mr. Thomas had not displayed the necessary leadership skills. Mr. Radliff stated that if he was hiring for another position or location at some point, "I might not need a leader, I might have a bunch of alphas over there." App., Vol. III at 647; *see also* App., Vol. II at 351 (rendering the punctuation as: "in the future, I might not need a leader—I might have a bunch of alphas over there"). Mr. Radliff also advised that in the future, Mr. Thomas might wish to have more and earlier interactions with the hiring manager. It is undisputed, however, that neither Ms. Harris nor Mr. Chavez had such contacts with Mr. Radliff.

---

[2] There are three recordings in the record, including this one. We cite to their location in the district court docket.

### 3. Internal Complaint

On April 25, 2018, Mr. Thomas contacted Amy Canton, a Human Resources Consultant with Farmers based in Olathe. In his email, Mr. Thomas expressed concern that Mr. Shelton had told Mr. Radliff about Mr. Thomas's marital status, age, and lack of children, when suggesting Mr. Thomas would be able to relocate to Phoenix for the AU position. Mr. Thomas also stated, "I believe my orientation adds another underlying factor to this." *Id.* at 309. And he questioned the appropriateness of Mr. Radliff's suggestion that Mr. Thomas develop "a 'Personal Relationship' . . . with the hiring manager." *Id.* Mr. Thomas did not mention the "alphas" comment in this email.

Mr. Thomas and Ms. Canton met in person the next day to discuss his complaint. During that meeting, Ms. Canton offered to contact Farmers' Talent Acquisition Department to obtain additional feedback. A Farmers employee contacted Mr. Radliff on May 8, 2018, to discuss Mr. Thomas's desire for further explanation.

On May 10, 2018, Ms. Canton emailed Mr. Thomas additional feedback. Mr. Thomas responded by taking issue with much of the information. Specifically, Mr. Thomas challenged Mr. Radliff's comments that Mr. Thomas lacked a prior relationship with Mr. Radliff; claimed Mr. Radliff had concluded Mr. Thomas "was not 'Alpha enough' (Alpha meaning male characteristics, dominating)"; and alleged Mr. Radliff had improperly "prescreened" Mr. Thomas "by coming up to [his] direct supervisor, asking and inquiring about [his] Marital status, Age, and the number of dependents [he] had, also the financial situation [he was] in." *Id.* at 314.

6

On May 11, 2018, Ms. Canton suggested she and Mr. Thomas meet with

Mr. Shelton to discuss Mr. Thomas's concerns. Six days later, on May 17, 2018,

Mr. Thomas indicated he wished to meet.

### 4. May 17, 2018, Call

Also on May 17, during a service call with an agent, Mr. Thomas refused to apply

a policy change based on a supporting document Mr. Thomas deemed unacceptable. The

agent seeking the change requested a callback from a supervisor; Mr. Thomas therefore

emailed Mr. Shelton. Mr. Shelton decided to accept the document. Mr. Thomas

responded to Mr. Shelton's decision in an email, explaining, "I deal with this agent all the

time. They call in yell and scream until someone gives them what they want. They are

clearly lying, committing fraud, and misrepresenting this household in order to get the

discount." *Id.* at 321. Noting he "disagree[d] 100 percent" with applying the discount,

Mr. Thomas listed five reasons he thought the document should not be accepted. *Id.*

In response, Mr. Shelton asked Mr. Thomas to come by his desk. In his interaction

log, Mr. Shelton stated his intent was "to talk about how I came to my conclusion" to

accept the document. *Id.* at 291. The log and Mr. Shelton's deposition testimony reflect

that when Mr. Shelton attempted to explain his decision, Mr. Thomas stated "Look, this

should have taken five minutes to pull the [recording of the] call. If you're not going to

do it, I will." *Id.* at 291–92. When Mr. Shelton indicated he did not need to pull the call,

Mr. Thomas "said 'whatever' and stood up and walked back to his desk during

[Mr. Shelton's] coaching." *Id.* at 292; *see also* App., Vol. I at 210 (Mr. Shelton stating

Mr. Thomas "stood up in the middle of the conversation and said, Look, if you're not going to pull the call, I will. And got up and walked off").

## 5. Final Warning

Later that same day, May 17, 2018, Farmers, through Mr. Shelton, issued Mr. Thomas a final warning. At Farmers, a final written warning prevents an employee from using tuition reimbursement or moving to another position in the company, and it may impact the employee's performance rating which in turn may negatively impact bonuses or merit increases in the employee's salary. It is the step before termination in Farmers' discipline process; it is unusual to issue a final written warning without first trying other forms of discipline. Mr. Thomas had not been formally disciplined prior to May 17, 2018.

Mr. Shelton asked Mr. Sims to attend the meeting at which Farmers issued Mr. Thomas the final warning. The final warning provides:

> You are receiving a Final Notice for a violation of Farmers policy.
>
> In addition to the coaching provided to you by your previous supervisor, you have been coached on multiple occasions over the past two months about emotional resilience, accepting and applying feedback to grow, as well as creating a low effort experience for our agents. Despite this ongoing coaching, you have not made improvements in these areas and you are not meeting expectations. I've offered you opportunities to grow, by speaking in team huddles and outlining documents to streamline our processes, to which you declined.
>
> Your continued lack of professionalism shows through your interactions with others; including the agents as well as with your direct supervisor. This behavior also creates a negative work environment with your peers. When you are approached with constructive feedback, you give pushback, you become argumentative, and are unwilling to accept the coaching. This lack of response to feedback resulted in an additional

8

coaching on 05/17/18, in order to highlight how to create a low effort experience. Your behavior during this coaching session was unprofessional and you displayed behaviors of insubordination. This further demonstrates your lack of openness and unwillingness to take constructive feedback to help you grow. To further detail what happened, see my recap of the coaching session below:

When trying to help you better understand my thought process on thinking outside the box to make the agents['] experience easier on a specific transaction, you made comments to me that display an extreme lack of professionalism. You also got up and walked out of our coaching session before it was over.

I expect you to immediately correct your behavior in compliance with Farmers policies, Vision, Mission and Values. Any further instances of this behavior, or other behavior in violation of Farmers policies will result in action up to and including termination of your employment.

App., Vol. II at 323. Mr. Thomas refused to sign the final warning.

After receiving the final warning, Mr. Thomas sent an email to Ms. Canton, indicating that Mr. Thomas was no longer interested in meeting with Mr. Shelton to discuss the AU selection process. Mr. Thomas was unwilling "to be harassed or picked apart, interrogated." *Id.* at 325.

## 6. EEOC Complaint

On May 21, 2018, Mr. Thomas filed an EEOC charge, alleging Farmers denied him the AU position on the basis of sex and that it issued the final warning as retaliation for his internal complaint about the AU position hiring process. In September, Mr. Thomas began reporting to Mr. Sims instead of Mr. Shelton. After becoming Mr. Thomas's supervisor, Mr. Sims contacted Mr. Shelton about Mr. Thomas multiple times, including noting that a coaching session would again be necessary due to Mr. Thomas's unprofessional telephone demeanor.

Ms. Canton, Farmers' human resources consultant, was asked at her deposition whether she "resolved" the internal complaint before Mr. Thomas filed an EEOC charge. She responded:

> I felt as though [Mr. Thomas's] concerns were resolved after we had gone through the providing information to him from Talent Acquisition offering to meet with him and [Mr. Shelton] to discuss further. Ultimately, he did end up on a final warning, but he had the open door with . . . his director, so based off of [the director] sharing with me how that conversation went, I felt as those concerns were resolved.

App., Vol. II at 500–01.

## 7. Filing of Complaint

Mr. Thomas filed the instant lawsuit on October 19, 2018. That same day, he mailed a waiver of service and the complaint to Farmers' Olathe office. When Farmers received notice of a lawsuit, the employees at the Olathe office who distribute the mail provide it to someone in human resources. There were three human resources employees who might receive a lawsuit in Olathe, one of whom was Ms. Canton. For example, Mr. Thomas mailed his Right to Sue Letter to the Olathe office on August 1, 2018, and Ms. Canton received it on August 2, 2018.

## 8. October 22, 2018, Call

On October 22, 2018, Mr. Thomas received a call from an agent seeking to make a policy discount retroactive. An audio recording of this call is included in the record. Mr. Thomas refused to backdate the discount based on the proffered documentation. The agent asked who she could talk to "to get that approved," and Mr. Thomas responded, "what do you mean?" App., Vol. III at 629; App., Vol. II at 368. The agent clarified she

10

wanted to know who could help her backdate the discount, to which Mr. Thomas replied the agent had not provided the proper documentation. The agent asked again who she could speak with to find out if backdating was possible, to which Mr. Thomas said, "you're talking to me." App., Vol. II at 368–69. When the agent asked to speak to Mr. Thomas's supervisor, Mr. Thomas stated he believed his supervisor was in a meeting, but he offered to have his supervisor, Mr. Sims, call her. The agent next asked to be transferred to Mr. Sims's voicemail. Mr. Thomas stated that Mr. Sims's voicemail was not set up, although it is undisputed that Mr. Sims's voicemail was in operation. The agent told Mr. Thomas she would call back with the documents but speak with someone else, stated that it was ridiculous he would not apply the discount, and asked his name. Mr. Thomas provided his name and told her he was "sorry that you think it's ridiculous." App., Vol. III at 669. The agent disconnected the call. Mr. Thomas did not report the call to Mr. Sims.

## 9. Termination

Mr. Sims nonetheless learned about the October 22, 2018, call, and met with Mr. Thomas and another supervisor, Cintia Mazzetta, on October 24, 2018. Mr. Thomas surreptitiously recorded this meeting and the recording is in the record. Although Mr. Thomas had followed Farmers' guidelines regarding backdating, Mr. Sims indicated Mr. Thomas should have handled the call better, especially by putting the agent in touch with a supervisor when requested. At the end of the meeting, Mr. Sims told Mr. Thomas that the meeting was a coaching opportunity to provide feedback for Mr. Thomas to use going forward.

11

On October 24 or 25, 2018, Mr. Thomas saw Ms. Canton visit Mr. Sims's desk, an interaction he thought unusual. Mr. Thomas points to this interaction as evidence that Mr. Sims knew about the lawsuit. But there is no direct evidence that either Mr. Sims or Ms. Canton was aware of the lawsuit prior to Farmers' termination of Mr. Thomas, and both Mr. Sims and Ms. Canton claim they first learned of the lawsuit after Farmers terminated Mr. Thomas's employment.

On October 25, 2018, Mr. Sims wrote a memorandum seeking support to terminate Mr. Thomas's employment. In the "Reason for Termination Recommendation" section, he wrote:

> [Mr. Thomas] was placed on a final warning on May 17, 2018 for policy violation regarding his emotional resilience, accepting/applying feedback and his professionalism and conduct with agents as well as his direct supervisor. While reviewing a call that [Mr. Thomas] received from an agent on October 22, 2018, he showed no resilience during the coaching session as to what could have been improved or changed during the interaction. From his viewpoint, it was a typical call with our customers. When the agent asked for a supervisor, he did not seek guidance and did not provide this information to leadership concerning the interaction nor the request for a supervisor. This type of behavior with the agents was also observed on an additional call on October 19, 2018. Due to his inability to accept feedback and apply emotional resilience and professional [sic] while interacting with our agents, the recommendation for termination is being made.

App., Vol. II at 335. Farmers terminated Mr. Thomas's employment the same day, October 25, 2018.

### B. *Procedural History*

Mr. Thomas's initial complaint alleged (1) discrimination on the basis of sex, due to Mr. Thomas's alleged nonconformance to male sex stereotypes, with respect to the AU

position and (2) retaliation by Farmers in issuing him the final warning after he had filed an internal complaint of discrimination. On July 17, 2019, Mr. Thomas amended his complaint to add a claim alleging (3) that his firing was discrimination based on sex and retaliation for filing his charge of discrimination with the EEOC and filing this suit. Farmers moved for summary judgment on all counts.

The district court granted Farmers' motion. With respect to Mr. Thomas's claim that Farmers denied Mr. Thomas the AU position on the basis of sex discrimination, the district court held the "alpha" comment did not constitute direct evidence of discrimination because it could bear a nondiscriminatory meaning. It assumed without deciding that Mr. Thomas had put forth a prima facie case of discrimination, but held Farmers had offered legitimate, nondiscriminatory reasons for not offering Mr. Thomas the AU position and, later, for terminating his employment. And the district court held Mr. Thomas had not adduced evidence of pretext regarding the AU position. It therefore granted summary judgment to Farmers as to the sex discrimination claim regarding the AU position.

Regarding the claim that Mr. Shelton's issuance of a final warning was in retaliation for Mr. Thomas's internal complaint, the district court rejected Mr. Thomas's argument that Ms. Canton's testimony constituted direct evidence of retaliation. The district court then held Mr. Thomas had established a prima facie case of retaliation due to the timing of his discrimination complaint and the final warning. Mr. Thomas conceded Farmers had articulated a legitimate, nonretaliatory reason for issuing the final warning, but claimed it was pretextual. The district court held that, although the temporal

13

proximity of the final warning and the internal complaint supported a prima facie case, Mr. Thomas had failed to present evidence of pretext aside from that timing, which standing alone, was insufficient. The district court therefore granted summary judgment to Farmers on the final notice retaliation claim.

Next, the district court held Mr. Thomas had waived a claim of discrimination with respect to his termination. Turning to Mr. Thomas's argument that his termination was retaliatory, the district court considered his claim under the circumstantial evidence framework, noting Mr. Thomas had not pointed to any direct evidence. It then assumed without deciding that Mr. Thomas had put forth a prima facie case of retaliation. The district court acknowledged that Farmers claimed to have fired Mr. Thomas for the legitimate, nondiscriminatory reason of his handling of the October 22, 2018, service call combined with his previous performance issues. And the district court held Mr. Thomas had not come forward with evidence sufficient to create a genuine issue of material fact regarding pretext. The district court therefore granted summary judgment to Farmers on the claims of discrimination and retaliation relating to Mr. Thomas's termination.

The clerk entered judgment on March 26, 2020, and Mr. Thomas filed a timely notice of appeal.

## II.    DISCUSSION

Mr. Thomas argues the district court erred in granting summary judgment on his (1) discrimination claim relating to Farmers' decision not to promote him, (2) retaliation claim relating to Farmers' issuance of a final warning, and (3) retaliation claim relating to

14

Farmers' termination of his employment.[3] He maintains he put forth direct evidence that Farmers' decision not to hire him for the AU position was discriminatory and its issuance of the final warning was retaliatory. Mr. Thomas further contends he demonstrated by circumstantial evidence that Farmers' explanations for each of the adverse employment decisions are pretextual covers for discrimination and retaliation. We begin our analysis by setting forth the standard of review and the relevant legal background. We then consider each of his three claims in turn.

## A. Standard of Review

This court "review[s] de novo a district court's grant of summary judgment." *Carolina Cas. Ins. Co. v. Burlington Ins. Co.*, 951 F.3d 1199, 1207 (10th Cir. 2020). Like the district court, "we must draw all reasonable inferences and resolve all factual disputes in favor of the non-moving party." *Jordan v. Maxim Healthcare Servs., Inc.*, 950 F.3d 724, 730 (10th Cir. 2020). "But an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility." *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (alteration in original) (internal quotation marks omitted) ("*Pioneer Centres*"). We affirm "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Jordan*, 950 F.3d at 730 (quoting Fed. R. Civ. P. 56(a)).

---

[3] Mr. Thomas does not argue the district court erred in holding he failed to support a claim of discrimination regarding his termination.

15

### B. *Legal Framework*

"To survive summary judgment on a Title VII claim of discrimination based on race, color, religion, sex, or national origin, a plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework" the Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). A Title VII retaliation claim also may be proven "either by direct evidence or by reliance on the *McDonnell Douglas* framework." *Id.*

### 1. Direct Evidence

To constitute direct evidence, a piece of evidence must demonstrate on its face the employment decision was reached for discriminatory or retaliatory reasons. *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (applying this definition in the discrimination context); *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1154 (10th Cir. 2008) (applying this definition in the retaliation context). Evidence is "direct" only if it "proves the existence of a fact in issue without inference or presumption." *Id.* (quotation marks omitted). A statement that "reflect[s] personal bias" does not constitute direct evidence of discrimination "unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). And even then, to be considered direct evidence, statements must be "closely linked to the adverse decision" by "the context or timing of the statements." *Id.* "Furthermore, if the content and context of a statement allow it to be

plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence." *Id.*

In *Tabor*, for example, we held that where a decisionmaker "explicitly stated a view that women ha[d] inferior knowledge . . . and inferior ability" regarding "central requirements of the job" during an interview and within the context of a woman's "discussion about her fitness for the position," the remarks constituted direct evidence of discrimination. *Id.* at 1217; *see also id.* ("The content of [the interviewer's] statements, the interview context, and the temporal proximity to the adverse employment decision directly link the discriminatory statements to his decision not to promote Ms. Tabor.").

But by contrast, in *Vaughn v. Epworth Villa* we determined a plaintiff had not shown direct evidence of retaliation where her employer asserted "it terminated her because she provided unredacted medical records to the EEOC." 537 F.3d at 1154. We explained, "one can easily interpret [the employer's] statements benignly to mean that it would have terminated [the plaintiff] for intentionally disclosing unredacted medical records to *any* third party," an act which "would have been contrary to the [employer's] policies and procedures, and ostensibly, the law." *Id.* at 1155. Because there was a benign explanation, the statement was not direct evidence of retaliation. *Id.* at 1154–55.

## 2. *McDonnell Douglas* **Framework**

The *McDonnell Douglas* "three-step burden-shifting framework" is used "to evaluate whether circumstantial evidence of discrimination presents a triable issue." *Fassbender*, 890 F.3d at 884; *see also Bekkem*, 915 F.3d at 1267 (explaining the *McDonnell Douglas* framework applies to retaliation claims). First, the plaintiff must

17

establish a prima facie case. For a discrimination claim, this entails showing, by a preponderance of the evidence "that [he] is a member of a protected class, [who] suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). For a retaliation claim, the plaintiff "must show (1) that [he] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Bekkem*, 915 F.3d at 1267 (quotation marks omitted).

The burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory or nonretaliatory reason for its actions. *Bennett*, 792 F.3d at 1266; *Bekkem*, 915 F.3d at 1267. If the defendant does so, the burden shifts back to the plaintiff "to show that the defendant's explanation was merely pretextual." *Bennett*, 792 F.3d at 1266. "A plaintiff can meet this burden to show pretext in either of two ways: (1) by showing that the proffered reason is factually false or (2) by showing that discrimination was a primary factor in the employer's decision." *Tabor*, 703 F.3d at 1218. This latter showing is often accomplished by demonstrating the proffered reasons "were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Bekkem*, 915 F.3d at 1268 (quotation marks omitted). But "[m]ere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Id.* (quotation marks omitted).

18

## C. The AU Position

### 1. Direct Evidence

In providing feedback to Mr. Thomas on his interview for the AU position, Mr. Radliff said that in the future, "I might not need a leader, I might have a bunch of alphas over there." App., Vol. III at 647. The district court held this was not direct evidence of discrimination on the basis of sex because the comment "d[id] not explicitly state anything discriminatory about [Mr. Thomas's] failure to conform to male sex stereotypes." *Id.* at 719. We agree with the district court.

As we require for direct evidence, there is a nexus between the statement and the adverse employment action: Mr. Radliff was explaining to Mr. Thomas why Mr. Thomas was not offered the AU position. *See Tabor,* 703 F.3d at 1216. But nexus alone is not enough. *Tabor* explains "if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence." *Id.* Mr. Thomas's argument on appeal is, essentially, that *Tabor* cannot mean what it says and we are not bound to follow it because the relevant statement is dicta. Mr. Thomas further asserts that *Tabor* is at odds with *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999), if interpreted to mean an ambiguous statement is not direct evidence of discrimination. For the reasons we now discuss, we are not persuaded.

First, this panel is bound to reject Mr. Thomas's argument. In *Vaughn v. Epworth Villa*, this court held a statement was not direct evidence of retaliation because it could be interpreted benignly. 537 F.3d at 1154–55. So, even if the statement in *Tabor* were dicta,

19

our holding in *Vaughn* is not. And Mr. Thomas directs us to no prior-in-time inconsistent holding of this court, subsequent en banc decision of this court departing from *Vaughn*, or intervening decision of the Supreme Court casting doubt on *Vaughn*'s holding. Accordingly, we must apply *Vaughn* here. *See Crowson v. Washington County*, 983 F.3d 1166, 1188–91 (10th Cir. 2020) (holding a panel of this court is bound by an earlier-in-time published holding, absent an intervening inconsistent en banc or Supreme Court decision).

Nor does our precedent conflict with the Supreme Court's decision in *Price Waterhouse*. There, the Court noted several "clear signs" of discrimination where an inference was necessary: male partners advised a female employee to take "a course at charm school" and criticized "her use of profanity." 490 U.S. at 235 (plurality opinion). Even if we assume these comments are similar to the "alphas" statement here because an inference is needed to determine the comments are motivated by sex stereotypes, we are not persuaded Mr. Thomas can prevail. As the district court explained, the Supreme Court "never considered whether those statements—alone—constituted direct evidence," given that the Supreme Court also said "the evidentiary '*coup de grace*' was that a partner told the female manager that to improve her chances for partnership, she should 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" App., Vol. III at 719–20 (quoting *Price Waterhouse*, 490 U.S. at 235 (plurality opinion)). Mr. Thomas does not explain why the district court's decision is inconsistent with *Price Waterhouse* despite these significant differences. Nor does he point to evidence in this case that is the equivalent of the *Price*

20

*Waterhouse* "evidentiary '*coup de grace*.'" *Id.* Accordingly, we do not read *Price Waterhouse* as precluding the district court's holding here.

Mr. Thomas next argues "*Perry* . . . permitted plaintiff[s] to show direct evidence with '*allegedly* discriminatory statements.'" Appellant Br. at 21 (emphasis in Appellant Br.) (quoting *Perry*, 199 F.3d at 1134). In his view, an "'allegedly' discriminatory statement" is different from "an unambiguously discriminatory statement." Reply Br. at 7. That is, Mr. Thomas equates "allegedly" as used in *Perry*, as synonymous with a statement supporting either a discriminatory or a benign meaning. But the language Mr. Thomas relies upon from *Perry* is a quotation from *Cone v. Longmont United Hospital Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994). *Perry*, 199 F.3d at 1134. It is not surprising that we used the word "allegedly" in *Cone* because it was unclear whether the statements there had been made at all. 14 F.3d at 531 ("Since a summary judgment decision is under review, we will assume that indeed [the relevant actors] made these comments in the contexts asserted by [the plaintiff]."). Regardless, *Cone* and *Perry* were decided on other grounds—in both cases, we held the comments did not have a sufficient nexus to constitute direct evidence of discrimination. *Id.*; *Perry*, 14 F.3d at 1134–35.

Mr. Thomas concedes on appeal that the "alphas" comment can be interpreted as non-discriminatory. He is right to do so. While a trier of fact could conclude the word "alpha" is laden with gender-based connotations, the statement nonetheless can be plausibly interpreted as benignly referencing leadership qualities. Accordingly, the district court was correct when it concluded the comment does not constitute direct evidence of discrimination. *See Vaughn*, 537 F.3d at 1154–55.

21

## 2. *McDonnell Douglas* Framework

As there is no direct evidence of discrimination, we turn to the *McDonnell Douglas* burden-shifting framework. Like the district court, we assume without deciding that Mr. Thomas' claim Farmers discriminated against him because he did not conform to male sex stereotypes establishes a prima facie case of discrimination on the basis of sex.[4] And Mr. Thomas concedes that Farmers met its burden of proffering a legitimate, nondiscriminatory reason for not offering him the AU position—namely, that the two people selected were more qualified than he. Our analysis therefore focuses on whether Mr. Thomas has demonstrated pretext.

Mr. Thomas argues he demonstrated pretext because: (1) there are inconsistencies in Farmers' proffered explanation, including Mr. Radliff noting Mr. Thomas had not

---

[4] On appeal, Mr. Thomas argues that his sexual orientation is another way in which he was discriminated against with respect to the AU position. The Supreme Court recently ruled that "it is impossible to discriminate against a person for being homosexual . . . without discriminating against that individual based on sex." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020). But Mr. Thomas cannot succeed on this theory for several reasons. First, this claim was not raised in the complaint. *Lawmaster v. Ward*, 125 F.3d 1341, 1351 n.4 (10th Cir. 1997) (holding this court focuses on the claims in the complaint). Indeed, the operative complaint makes no mention of Mr. Thomas's sexual orientation. Second, there is no genuine dispute that Mr. Radliff was unaware of Mr. Thomas's sexual orientation when he filled the AU positions. *See* App., Vol. II at 378 (Mr. Thomas controverting the statement that Mr. "Radliff did not know [Mr. Thomas] was gay" only by pointing to evidence that Mr. Radliff learned Mr. Thomas was gay after the complaint was filed—which was after Mr. Radliff selected other candidates for the AU positions). Thus, even if Mr. Thomas could raise this theory now, it would necessarily fail. *See Singh v. Cordle*, 936 F.3d 1022, 1043 (10th Cir. 2019) (holding, in the retaliation context, that an inference of retaliation could not be drawn where no evidence showed the decisionmakers were aware of the plaintiff engaging in protected action). Third, as we explain, Mr. Thomas has not shown the proffered nondiscriminatory reasons were pretextual.

previously developed a relationship with the hiring manager (Mr. Radliff), Mr. Radliff claiming leadership was a qualification for the position despite the position not being a leadership position, and Mr. Radliff checking the box that Mr. Thomas demonstrated teamwork and leadership; and (2) Mr. Radliff's desire to provide feedback in person, which Mr. Thomas suggests could allow a jury to infer Mr. Radliff knew his feedback was improper. Mr. Thomas also argues the district court improperly analyzed these reasons individually rather than collectively.

Our review of the district court's decision indicates it properly concluded the inconsistencies Mr. Thomas alleged, taken together, are insufficient to demonstrate pretext. First, Mr. Radliff requesting an in-person meeting does not give rise to a reasonable inference of discrimination. *See Riggs v. Airtran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (noting at summary judgment a court must determine whether the nonmoving party has adduced sufficient evidence to allow the jury to draw an inference). We have explained that an inference is unreasonable—that is, it is speculation—where it "renders [the factfinder's] findings a guess or mere possibility." *Pioneer Centres*, 858 F.3d at 1334 (alteration in original) (quotation marks omitted). Here, a jury would have to make two speculative leaps to hold Farmers liable: it would first need to assume the reason Mr. Radliff wanted to meet in person was to avoid a written record, and then also assume Mr. Radliff wished to avoid a written record because he "knew there was something improper about [his] reasons." Appellant Br. at 30. Because no evidence suggests either conclusion would be more than a guess, the district court properly rejected this as baseless speculation, rather than a proper inference.

23

Second, no reasonable jury could find Mr. Radliff did not hire Mr. Thomas for the AU position because Mr. Thomas did not have sufficient prior interactions with Mr. Radliff. The audio recording of the April 23, 2018, meeting reveals that when Mr. Radliff raised the importance of interactions with hiring managers, he was providing advice "for future reference." ECF No. 61-10 3:00–3:50. Thus, that advice cannot undermine the reasons provided for not selecting Mr. Thomas for one of the AU positions.

Third, there is no genuine dispute that while the AU position was not posted as a leadership position, Mr. Radliff viewed leadership as a desirable quality in the candidates. Indeed, the guide for the interviews listed leadership as an area to be explored with the candidates. Further, checking the box that Mr. Thomas demonstrated leadership does not indicate he exhibited the desired skillset more than the successful candidates did.

Taken together, Mr. Thomas's speculative reasons do not constitute evidence from which a rational trier of fact could reasonably infer pretext. We therefore affirm the grant of summary judgment on the AU position discrimination claim.

### D. Final Written Notice

### 1. Direct Evidence

Mr. Thomas points to a statement from Ms. Canton's deposition as direct evidence of retaliation. Ms. Canton testified:

> I felt as though [Mr. Thomas's] concerns were resolved after we had gone
> through the providing information to him from Talent Acquisition offering
> to meet with him and [Mr. Shelton] to discuss further. Ultimately, he did
> end up on a final warning, but he had the open door with . . . his director, so

24

based off of [the director] sharing with me how that conversation went, I felt as those concerns were resolved.

App., Vol. II at 500–01.

Direct evidence in this context must "prove[] the existence of a fact in issue without inference or presumption." *Fassbender*, 890 F.3d at 883 (quotation marks omitted). Ms. Canton's testimony does not meet that standard. Even assuming Ms. Canton's testimony meant the final warning resolved Mr. Thomas's complaint, the jury would be left to infer whether Mr. Thomas's complaint happened to be resolved because Farmers issued him a final warning based on his performance issues or whether Farmers "resolved" his complaint by issuing the final warning. Ms. Canton's testimony says nothing about this question and is therefore not direct evidence of retaliation.

Mr. Thomas argues that our precedent limits the instances in which the need for an inference prevents a statement from being "direct evidence" to only the precise circumstances of *Riggs*: "the inference that because a decision maker holds a certain bias towards a group, his adverse action towards a member of the group was made because of that bias." Appellant Br. at 34. According to Mr. Thomas, statements requiring an inference constitute "direct" evidence in all other circumstances. Mr. Thomas misapprehends *Riggs*, however, and has failed to provide a citation to any decision in which we have treated evidence as direct when its probative value depends upon an inference. But even if the forbidden category of inferences were as narrow as Mr. Thomas suggests, he could not prevail.

25

The inference Mr. Thomas advances is that because he made an internal complaint about not being offered a job within the company, and the final warning prevented him from seeking an internal position, we can infer the final warning was retaliatory. This is similar to inferring that, because a decisionmaker had a bias and a person belonging to a group against whom he was biased suffered an adverse employment action, the adverse employment action was because of that bias. In sum, the inference necessary here is analogous to the type of inference forbidden in *Riggs*. The district court did not err in holding that Ms. Canton's statement is not direct evidence of retaliation.

## 2. *McDonnell Douglas* Framework

Again, we must turn to circumstantial evidence and the *McDonnell Douglas* framework. Farmers concedes the "proximity in timing" between the internal complaint and the final warning—three weeks—"is likely sufficient to establish a prima facie case" of retaliation. Appellee Br. at 42. And Mr. Thomas concedes Farmers met its burden of articulating a nonretaliatory reason for issuing the final warning by offering evidence that it issued the final warning due to Mr. Thomas's insubordination, lack of professionalism, and failure to improve in response to feedback. Accordingly, the parties again engage on the issue of pretext.

Mr. Thomas argues evidence of pretext includes: (1) the temporal proximity between the final warning and the internal complaint; (2) the inconsistency between his supervisors' criticisms that he was not accepting or applying feedback and their praise for him being open to coaching; (3) the absence of any complaints from his coworkers to support the claim he was creating a negative work environment; (4) Mr. Shelton's

26

issuance of a final warning without first using lesser discipline; and (5) Mr. Shelton's inconsistent behavior regarding Mr. Thomas.[5] Mr. Thomas also contends the district court erred by taking his arguments individually rather than as a whole.

The fact that Mr. Thomas sometimes accepted feedback and demonstrated occasional improvement does not change that the record is replete with instances of his failure to do so, including during the May 17, 2018, phone call and meeting. Similarly, Mr. Shelton's behavior toward Mr. Thomas was not inexplicable or inconsistent. After Mr. Shelton provided feedback to Mr. Thomas on numerous occasions, Mr. Shelton informed his own supervisor that the coaching phase was done: "now I'm in an observation period to see if [Mr. Thomas] responds to the coaching or keeps with his ways and this will determine my next steps of corrective action." App., Vol. II at 319. Although Mr. Shelton praised Mr. Thomas on the occasions he accepted coaching, Mr. Shelton acknowledged that only future observation would reveal whether Mr. Thomas "keeps with his ways," warranting further "corrective action." There is nothing inconsistent in these statements. When the events of May 17, 2018, showed Mr. Thomas had not responded to coaching, Mr. Shelton took "next steps of corrective

---

[5] Mr. Thomas also argues that the nature of a final warning, which prevented him from applying for other internal positions, constitutes circumstantial evidence that the discipline was retaliatory. But he did not raise this argument before the district court. *See* App., Vol. II at 421–24 (Mr. Thomas's response in opposition to summary judgment, not making this argument). We therefore do not consider it. *Strauss v. Angie's List, Inc.*, 951 F.3d 1263, 1266 n.3 (10th Cir. 2020) ("Generally, this court does not consider arguments raised for the first time on appeal.").

action." In short, no rational trier of fact could agree with Mr. Thomas that Mr. Shelton's statements are so inconsistent as to show pretext.

Next, Mr. Thomas contends that because none of his coworkers complained about his behavior, Mr. Shelton's statement that Mr. Thomas was creating a negative working environment is evidence of pretext. Again, Mr. Thomas merely speculates that the absence of employee complaints demonstrates Mr. Shelton did not believe Mr. Thomas was creating a negative work environment. Even in the absence of complaints, Mr. Shelton could perceive Mr. Thomas's attitude as a bad influence on other employees. And Mr. Thomas offers no evidence suggesting Mr. Shelton did not sincerely hold that belief. *See DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970–71 (10th Cir. 2017) (holding that to be worthy of credibility the employer's reason need not be objectively correct, but rather the employer must subjectively believe the reason).

Nor could a factfinder reasonably infer only from the timing and the severity of punishment that Mr. Shelton's reasons were pretextual. *See Bird v. West Valley City*, 832 F.3d 1188, 1204 (10th Cir. 2016) ("[E]ven though the timing leading up to an employee's termination is *evidence* of pretext, it is not sufficient standing alone to *establish* pretext." (emphases in original) (citation omitted)). The record reflects Mr. Shelton had been coaching Mr. Thomas about his telephone demeanor since March, with no lasting success. Mr. Shelton also documented Mr. Thomas's insubordinate behavior immediately prior to the final warning. Under these circumstances, the decision to issue a final warning does not support an inference of pretext. Although Mr. Shelton could have pursued lighter discipline, he was not required to do so. *See Timmerman v. U.S. Bank,*

28

*N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007) (holding, in an age discrimination case, where "progressive discipline was entirely discretionary" and the employer "did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline [was] not evidence of pretext"); *Dyer v. Lane*, 564 F. App'x 391, 395 (10th Cir. 2014) (unpublished) (same, in a Title VII discrimination case). We therefore affirm the grant of summary judgment on the retaliation claim regarding the final warning.

### E.  Termination

Mr. Thomas relies solely on circumstantial evidence to support his claim that Farmers terminated him in retaliation for protected activity. We therefore analyze his claim only under the *McDonnell Douglas* framework. Like the district court, we assume without deciding that Mr. Thomas has made out a prima facie case of retaliation. And Mr. Thomas concedes Farmers met its burden of articulating a nonretaliatory reason for his termination—namely, his handling of the October 22, 2018, call and his inability to accept feedback. So, here too, our analysis narrows to the issue of pretext.

Mr. Thomas argues his handling of the October 22, 2018, call was a pretextual reason for Farmers terminating his employment because (1) Mr. Thomas's offer of a supervisor callback was sufficient, (2) Mr. Thomas followed Farmers' policy on backdating, (3) despite Mr. Sims's citing the final warning in the memorandum recommending termination, the final warning did not discipline Mr. Thomas for failing to bring a call to his supervisor's attention, and (4) Mr. Sims initially decided not to terminate Mr. Thomas, instead telling Mr. Thomas the feedback should be applied going forward. Mr. Thomas also contends the termination memorandum's statement that he was

fired because of his inability to accept feedback is inconsistent because the recording of the October 24, 2018, meeting showed he was receptive to feedback, and he had received substantial praise for accepting feedback in the past.

The first three arguments about the October 22, 2018, call all fail for the same reason: the legitimate, nondiscriminatory reason offered for termination was not the merit of Mr. Thomas's substantive position on the call, but rather Mr. Thomas's tone with the agent and his subsequent unwillingness to accept feedback about the call. In the memorandum regarding termination, Mr. Sims indicated Mr. Thomas "showed no resilience during the coaching session as to what could have been improved or changed during the" October 22, 2018, call. App., Vol. II at 335. The memorandum identifies Mr. Sims's other primary concern as Mr. Thomas's "inability to . . . apply emotional resilience and professional [sic] while interacting with . . . agents." *Id.*

Nowhere has Farmers asserted that it terminated Mr. Thomas for refusing to backdate a discount. Regarding Mr. Thomas's failure to alert his supervisor about the call, the record is clear that Mr. Sims expected Mr. Thomas to do so. Whether or not Mr. Thomas was required to inform Mr. Sims under Farmers policy is immaterial—he does not meaningfully contest the sincerity of Mr. Sims's belief. "Evidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *DePaula*, 859 F.3d at 970–71 (internal quotation marks omitted). Relatedly, while the final warning did not involve a failure to bring a call to a supervisor's attention, the final warning disciplined

30

Mr. Thomas for exhibiting inappropriate behavior toward an agent seeking assistance on a service call and for being unreceptive to feedback. These were the same issues that Mr. Sims cited in support of Mr. Thomas's termination. We agree with the district court that the circumstances are not so dissimilar as to suggest the reasons for termination were pretextual.

Mr. Thomas next argues he was receptive to feedback in the October 24, 2018, meeting, relying on his summary judgment response and the recording of the meeting. But the issue is whether a reasonable jury could find that Mr. Sims did not sincerely view Mr. Thomas as being unreceptive to feedback. *DePaula*, 859 F.3d at 970–71. Such a finding is not supported by the record evidence. In Mr. Thomas's view, he said "okay" receptively to several points of feedback during the meeting. But the recording of the meeting reveals numerous instances of Mr. Thomas disagreeing with Mr. Sims's and Ms. Mazzetta's feedback and characterization of the call. Indeed, near the end of the meeting, Ms. Mazzetta says: "I feel like there's a lot of pushback and you're not trying to see that right now, so we're wasting a lot of time. So I think that maybe come back to it later when you're ready to talk to [Mr. Sims] about it and say, 'you know what, I could have improved in that.'" ECF No. 61-9 33:02–33:14. No rational jury could conclude after listening to the recording of the discussion that Mr. Sims's concern about Mr. Thomas not accepting feedback was pretextual.

Mr. Thomas's final argument is that Mr. Sims had decided not to terminate him at the end of the October 24 meeting, and that nothing after that meeting is offered as a reason for termination. It is true Mr. Sims closed the meeting by saying "This is a

coaching opportunity. It's something for you to listen to, to reflect on, to hear the feedback that [we] . . . have provided and apply that to those calls going forward, so we don't encounter a situation like this." *Id.* at 35:37–35:54. Thus, it is possible Mr. Sims had not yet decided what to do about Mr. Thomas when the meeting concluded. But as Farmers maintains, "there is [also] no evidence in the record that [Mr.] Sims had decided at the end of the . . . meeting not to terminate" Mr. Thomas. Appellee Br. at 54. The district court noted Mr. Sims's statement "suggests no imminent termination" but because the termination "was based, in part, on [Mr. Thomas's] behavior in [that] meeting, [Mr.] Sims's comment is insufficient to support a finding of pretext." App., Vol. III at 741. Even assuming Mr. Sims had not yet decided to fire Mr. Thomas at the end of the October 24 meeting, nothing about that indecision supports a finding that the reasons given for termination when the decision was made were pretextual.

Mr. Thomas claims the jury could reasonably infer that Mr. Sims changed his mind and fired Mr. Thomas because Mr. Sims learned about the lawsuit after the October 24 meeting. He bases this on his testimony that he observed Ms. Canton stop by Mr. Sims's desk. To make that inference, though, the jury would have to conclude Ms. Canton went to Mr. Sims's desk (1) for the purpose of informing Mr. Sims about Mr. Thomas filing this lawsuit and (2) after Mr. Thomas's October 24 meeting (which ended at 11:48 a.m., *see* ECF No. 61-9 36:14–36:15). Both conclusions would require the jury to speculate.

The evidence establishes only that Ms. Canton was one of three people at the Olathe office who might receive notice of a lawsuit. Nothing demonstrates she in fact

received *this* lawsuit, and she denies that she did. Mr. Thomas suggests it is more likely that Ms. Canton was the employee who received the lawsuit because of her involvement in the case, but he offers no evidence in support, only speculation. And even if the jury could conclude Ms. Canton eventually would receive the lawsuit, it would be pure speculation to conclude she received it by October 25, 2018.

As for timing, the evidence proffered by Mr. Thomas shows Ms. Canton went to Mr. Sims's desk sometime on the 24th or 25th of October, but not which day, or whether it was before or after his meeting with Mr. Sims. Accordingly, even if the evidence suggests Mr. Sims changed his mind about terminating Mr. Thomas's employment, no rational jury could find his reasons were pretextual.[6] We therefore affirm the grant of summary judgment on Mr. Thomas's claim of retaliatory termination.

### III.    CONCLUSION

We **AFFIRM**.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

[6] Mr. Thomas also argues that because the final warning was a but-for cause of Farmers' decision to terminate his employment, if the final warning was retaliatory, his termination was as well. Because we hold that Mr. Thomas has failed to show the issuance of the final warning was retaliatory, section II.D.2, *supra*, this argument necessarily fails.